**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB | § | |
| and DUSTIN STAFFORD, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. |
| v. | § | |
| | § | |
| WOODVILLE PELLETS, LLC, | § | JURY DEMANDED |
| | § | |
| | § | |
| Defendant. | § | |

## <u>COMPLAINT</u>

Sierra Club and Dustin Stafford (collectively, "Plaintiffs") file this Original Complaint (the "Complaint") against Woodville Pellets, LLC ("Woodville Pellets" or "Defendant") and in support show the following:

## I.    NATURE OF ACTION

1.    Plaintiffs bring this action against Woodville Pellets under the citizen suit provision of the Federal Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq.* (the "Clean Air Act" or the "Act"). 42 U.S.C. § 7604.

2.    This suit relates to continuing and past violations of the Clean Air Act at Woodville Pellets' wood pellet manufacturing facility at 164 County Road 1040, Woodville, Texas 75979 (the "Facility").

3.    As a necessary byproduct of wood pellet production, the Facility emits large amounts of volatile organic compounds ("VOCs"), particulate matter ("PM"), hazardous air pollutants

("HAPs"), nitrogen oxides, sulfur dioxide, and carbon monoxide. These emissions are subject to regulation under State Implementation Plan ("SIP") Permit No. 98014.

4.      The Facility has been out of compliance with the Clean Air Act and Texas' federally enforceable SIP each day it has operated since it began operating in 2013, primarily because key units emit more than 500 tons of unpermitted VOCs and dozens of tons of unpermitted HAPs per year when operating. The previous owner acknowledged the excess VOC emissions in 2015 and, in 2018, agreed to install additional air pollution control technology to remedy the noncompliance. Instead of bringing the plant into compliance as quickly as possible after acquiring the plant on June 18, 2019, however, Woodville Pellets will not even *begin* construction of the air pollution controls needed to achieve compliance with VOC and HAP limits until April 2022. Further, Woodville Pellets has not committed to a firm date for when the control will be installed and operating. Without that additional control technology installed and operating, the Facility continues to violate the Clean Air Act and the Texas SIP each day it operates.

5.      As a separate issue, since acquiring the Facility, Woodville Pellets has utilized "bypass stacks" on dozens of occasions to circumvent existing and effective air pollution controls that reduce emissions from the Facility's furnaces and wood dryers. The Facility's SIP Permit does not authorize use of these bypass stacks. When Woodville Pellets uses the bypass stacks, it emits large amounts of PM, VOCs, HAPs, nitrogen dioxides, carbon monoxide, sulfur dioxide, smoke, and soot from the Facility's furnaces and wood dryers directly to the atmosphere. These releases from uncontrolled and unpermitted bypass events often last many hours, harming the health and welfare of the surrounding community.

6.      By this suit, Plaintiffs seek injunctive relief, imposition of civil penalties, and associated costs of the litigation (including court costs, attorney's fees, and expert witness fees and costs) for

the Defendant's repeated violations of emissions standards in its permit issued pursuant to Sections 110 and 112 of the Clean Air Act. 42 U.S.C. §§ 7610, 7412.

## II.    PARTIES

### A.    PLAINTIFFS

7.    Plaintiff Sierra Club sues on behalf of its members. The Sierra Club is a non-profit public interest organization organized under the laws of the State of California, with its principal offices in San Francisco, California. The Lone Star Chapter is dedicated to protecting Texas' natural resources, the health of its people, and preserving the state's many beautiful and unique natural landscapes. In this matter, the Sierra Club seeks to protect the air quality in and around Woodville to protect its members' health and their ability to safely pursue and enjoy outdoor activities in the Woodville area.

8.    Dustin Stafford is an individual and resident of the State of Texas, who lives and resides at 888 Country Road 4260, Woodville, Texas, 75979, located in Tyler County, Texas. Stafford is a "citizen" and a person as defined under the Clean Air Act, Section 302(e). 42 U.S.C. § 7602(e). Dustin Stafford is also a member of the Sierra Club.

9.    In addition to Dustin Stafford, Sierra Club has multiple other members who live or spend significant time in close proximity (less than 3.5 miles) to Woodville Pellets (hereafter, "Sierra Club's members"), including several who live close enough that the visible plume from the facility frequently passes over their homes.

10.    The individual citizen and Sierra Club's members reside, own property, breathe the air, and/or use areas near the Facility in Woodville, Texas. They use and enjoy the benefits of natural resources into which Defendant has emitted, and continues to emit air pollutants, including substantial levels of unpermitted PM, VOCs, HAPs, smoke, soot, and wood dust. The interests of

the individual citizen and Sierra Club's members have been, are being, and will be adversely affected by Defendant's emission of pollutants into the air in violation of its SIP Permit and of federally enforceable air pollution standards.

**B.    DEFENDANT**

11.    Defendant Woodville Pellets, LLC is a limited liability company organized under the laws of the State of Delaware. Woodville Pellets, LLC may be served with process through its registered agent for service of process, C.T. Corporation System, at 1999 Bryan St., Ste. 900, Dallas, Texas 75201-3136. Since June 18, 2019, Woodville Pellets has owned and operated the wood pellet manufacturing facility at issue after it purchased the Facility from the previous owner and operator, German Pellets Texas, LLC ("German Pellets").

12.    Woodville Pellets is a "person" within the meaning of Section 302(e) of the Clean Air Act. 42 U.S.C. § 7602(e).

**C.    SERVICE TO OTHER REQUIRED PARTIES**

13.    The U.S. Attorney General and the U.S. EPA Administrator will be served with a copy of this Complaint as required by the citizen suit provisions of the Clean Air Act. 42 U.S.C. § 7604(c)(3).

**D.    EFFECTS OF WOODVILLE PELLETS' UNPERMITTED AIR POLLUTION ON PLAINTIFFS**

14.    Woodville Pellets operates its Facility in Woodville, Texas, which has an estimated population of 2,614 and covers approximately 3.21 square miles for its city limits.

15.    The Facility is the only regulated facility in the Woodville area that emits significant quantities of PM, VOCs, HAPs, nitrogen oxides, and carbon monoxide.

16.    Woodville Pellets is subject to regulatory limitations imposed by SIP Permit No. 98014 which lists the type and amount of air pollutants the Facility is allowed to release, while establishing that any air contaminant not named in the permit, or those in excess of the limits

4

established therein or from emission points other than those authorized therein, are strictly prohibited from being emitted in any volume. These emission restrictions mitigate the potential adverse health and environmental impacts of the Facility's air pollution on the surrounding community.

17.    VOCs are gases which may adversely affect the health of those exposed to them in the short and long-term. VOCs combine with nitrogen oxides and sunlight to create ground level ozone and smog; breathing ground level ozone is harmful for any person, but especially for the elderly, children, and those with health issues like asthma. VOCs also directly cause breathing difficulty and irritation to the respiratory system. Finally, VOCs also encompass many harmful toxic or carcinogenic pollutants that are also regulated as HAPs, discussed below.

18.    Defendant's unlawful emissions of excess VOCs into the air contributes to elevated levels of VOCs, ground level ozone, and smog in the area surrounding Defendant's Facility, including greater Woodville. The individual citizen and Sierra Club's members have repeatedly and intermittently suffered injury from the Facility's unlawful VOC pollution since it began operating in 2013 and since Defendant acquired the Facility in June 2019.

19.    HAPs, also known as air toxics, are those substances which are known or suspected to cause cancer, or other serious health side effects such as birth defects. Specifically, HAPs are pollutants that Congress has listed as toxic or carcinogenic even in small qualities. HAPs emitted from wood pellet processing facilities include acetaldehyde, acrolein, formaldehyde, hydrochloric acid, methanol, phenol, and propionaldehyde.

20.    The Facility's current SIP Permit limits emissions of any single HAP to no more than 10 tons per year and limits total HAP emissions to no more than 25 tons per year. The purpose of these limits is to restrict the Facility's emissions to below the "major source" level set forth in

Clean Air Act § 112(a)(1), 42 U.S.C. § 7412(a)(1), thereby enabling the Facility to avoid more stringent HAP control requirements. The Facility is currently exceeding these emission limits on HAPs.

21.    These excess emissions of HAPs into the air contribute to elevated levels of HAPs in the area surrounding the Facility. The individual citizen and Sierra Club's members have repeatedly and intermittently suffered injury from the Facility's unlawful HAP pollution since the facility began operating in 2013 and since Defendant acquired the Facility in June 2019.

22.    However, neither Woodville Pellets, nor the prior owner German Pellets, have conducted any emissions testing to demonstrate compliance with limits on HAP emissions.

23.    The most reliable testing from this industry indicates that the Facility has the potential to emit HAPs at rates far higher than the 10 and 25 ton per year limits. Specifically, Enviva, the largest pellet company in the world, released information based on stack tests at numerous comparable pellet plants that indicate a facility the size of Woodville Pellets' would likely emit around 130 tons of total HAPs per year, including 83 tons per year of methanol, 21 tons per year of acrolein, 14 tons of formaldehyde, and many other HAPs at lower rates.

24.    Based on Enviva's comparable emissions data, the Facility has exceeded the applicable limits of 10 tons per year of any individual HAP and 25 tons per year of total HAP on a regular basis and will continue to do so until it installs additional control technology.

25.    Dustin Stafford is an individual plaintiff. He has lived within one mile of the Facility since 2013. Mr. Stafford lives, works, recreates, and conducts other activities in Woodville, Texas in proximity to the Facility.

26.    Since the Facility began operating in 2013, Mr. Stafford has seen adverse effects on the environment and on the health of himself and members of his community. The Facility produces

both visible air pollution, in the form of smoke, soot, and dust, as well as odors, which impact Mr. Stafford at his home.

27.     Since Defendant acquired the facility on June 18, 2019, Mr. Stafford and Sierra Club's members have personally witnessed and documented many "bypass" events when Woodville Pellets emits air pollution directly from its furnaces and wood dryers rather than sending emissions to existing air pollution controls, in violation of the Facility's SIP Permit.

28.     When these bypass events occur, visible emissions of PM, smoke, soot, and wood dust from the facility often migrate into the surrounding community, including the homes and properties of Mr. Stafford and Sierra Club's members.

29.     Mr. Stafford and Sierra Club's members are able to smell odors from the Facility during these bypass events.

30.     Woodville Pellets' unauthorized emissions threaten Mr. Stafford's health and that of his family members. Specifically, Mr. Stafford fears for his own health and that of his family members and pets.

31.     Likewise, Woodville Pellets' unauthorized emissions threaten the health of Sierra Club's members, and those members fear for their own health and that of their families.

32.     Mr. Stafford, his family, and Sierra Club's members have experienced serious health issues likely related to the Facility's violations of its SIP Permit, the Texas SIP, and the Act. These health issues include both allergies and respiratory problems.

33.     In addition to harm to Mr. Stafford, the Facility's permit violations have harmed and will continue to harm his seven-year-old son and Mr. Stafford's mother, who lives next door to Mr. Stafford.

34.     Over the winter of 2019-2020, Mr. Stafford developed breathing issues, including a constant runny nose, and a sore, itchy throat. These symptoms persist to the present day and are unlike anything Mr. Stafford has experienced previously.

35.     Mr. Stafford has visited a doctor who confirmed he is not suffering from any infection or other identifiable illness. Mr. Stafford believes air pollution from Woodville Pellets causes or aggravates these symptoms.

36.     Dustin Stafford has also considered moving away from the Facility because of the impact on both his property values and his health.

37.     The Plaintiffs have, with the aid of environmental monitoring organizations, placed air monitors manufactured by Purple Air around the Facility and have also used handheld monitors manufactured by Atmotube to assess the air quality near the Facility. These air monitors have indicated the presence of PM pollution and VOCs in the area and increases in measured rates of PM and VOC that correlate to visible emissions during observed bypass events.

38.     Plaintiffs have been injured by Woodville Pellets' unpermitted and uncontrolled release of pollution into the atmosphere. These injuries include, but are not limited to, pollution of their real and personal property, exposure to unhealthy air quality, and fear that the Facility's unlawful pollution is and will adversely impact their health and the health of their family members and pets. Sometimes the conditions are created by the Facility are severe enough that Plaintiffs refrain from outdoor activities.

39.     Mr. Stafford and Sierra Club's members near the plant have an interest in seeing the Facility's violations of its SIP Permit, the Texas SIP, and the Act prosecuted so as to preserve their right to the enjoyment of their homes and land without interference and to safeguard their health. Mr. Stafford also has an interest in protecting the health of his son and mother.

40.     Based on the authority provided under the Clean Air Act for the Court to issue injunctive relief to prevent emissions in excess of permitted limits, a favorable decision by this Court will force Woodville Pellets to cease, desist, and abate unpermitted air pollution from its Woodville, Texas Facility. Imposition of civil penalties would likewise discourage Woodville Pellets from engaging in future activities that result in the Facility's release of unpermitted air pollution.

### III.     AUTHORITY TO BRING SUIT, JURISDICTION, AND VENUE

41.     Plaintiffs' action against Woodville Pellets arises under the Clean Air Act for past and ongoing violations of its SIP Permit, the Texas SIP, and the Act. Plaintiffs' action is related to Woodville Pellet's operation of a wood pellet manufacturing facility in Woodville, Texas, which is regulated by the Texas Commission on Environmental Quality ("TCEQ").

42.     Plaintiffs have authority to bring the specific claims alleged below under 42 U.S.C. § 7604. Specifically, 42 U.S.C. § 7604(a)(1) authorizes civil action against "any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter."

43.     The Clean Air Act's citizen suit provision defines "emission standard or limitation under this chapter" as to include an "emission limitation, standard of performance or emission standard." 42 U.S.C. § 7604(f)(1). The Act additionally defines "emission standard or limitation under this chapter" to include "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V [Title V] or under any applicable State implementation plan approved by the Administrator, any permit term or condition." 42 U.S.C. § 7604(f)(4).

44.     The specific claims alleged below arise from repeated and ongoing violations of emission limits and standards set forth in SIP Permit No. 98014 issued pursuant to Texas' federally-

approved SIP, and these violations are therefore enforceable under 42 U.S.C. § 7604(f)(1) and (f)(4).

45.    Additionally, Woodville Pellets is subject to a Title V operating permit, Federal Operating Permit No. O3609, issued September 17, 2015, which requires that the "[p]ermit holder shall comply the requirements of New Source Review authorizations issued or claimed by the permit holder for the permitted area, including permits," and that requirements of such New Source Review permits "are incorporated by reference into this [Title V] permit as applicable requirements." Federal Operating Permit No. O3609, Condition 7 (Sep. 17, 2015). SIP Permit 98014 is a New Source Review permit that has been incorporated into Federal Operating Permit No. O3609, and therefore violations of the conditions of SIP Permit 98014 are also enforceable through Title V pursuant to 42 U.S.C. § 7604(f)(4).

46.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 7604(a) (Clean Air Act jurisdiction). An actual, justiciable controversy exists between Plaintiffs and Defendant Woodville Pellets.

47.    The citizen suit provision of the Clean Air Act grants jurisdiction to United States District Courts to issue an injunction remedying violations of the Clean Air Act, to impose appropriate civil penalties for violations of the Clean Air Act, and to award costs of litigation (including reasonable attorney and expert witness fees).

48.    Venue is properly vested in the Eastern District of Texas, Lufkin Division, pursuant to Section 304(c)(1) of the Clean Air Act, 42 U.S.C. § 7604(c)(1), as Woodville Pellets' Facility is located in this District.

## IV.    NOTICE

49.    On May 5, 2020, Plaintiffs Sierra Club and Dustin Stafford (individual) gave notice by certified mail to Woodville Pellets of the violations alleged in this complaint and their intent to sue under the Clean Air Act as required by 42 U.S.C. 7604(b). Plaintiffs also sent copies of the notice letter by certified mail to the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA, Region 6, the Director of the TCEQ, and the Attorney General of Texas. A copy of the Notice Letter is attached to the Complaint as Exhibit A and incorporated by reference herein. Certified mail receipts are attached to the Complaint as Exhibit B.

50.    The notice letter provided sufficient information to allow Woodville Pellets to identify and attempt to correct its violations of its federally enforceable SIP Permit, the Texas SIP, and the Act.

51.    More than sixty days have elapsed since the notice described in the preceding paragraph was properly served, and neither EPA nor TCEQ has commenced diligent prosecution of a civil or criminal action in a court to address the violations.

52.    Woodville Pellets has done nothing to stop or reduce its continuing discharge of unpermitted VOCs and HAPs that occur each day the plant operates.

53.    The Facility has likewise continued to utilize its unauthorized bypass stacks to emit PM, VOCs, HAPs, nitrogen oxides, carbon monoxide, and sulfur dioxide, smoke, soot, and dust.

54.    Finally, Woodville Pellets has not responded to Plaintiffs' invitation to discuss the allegations or possible remedies for the violations identified in the notice letter.

## V.    STATUTORY AND REGULATORY BACKGROUND

55.    A central purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).

56.    To achieve this and other purposes, the states bear primary responsibility under the Clean Air Act for regulating sources of air pollution and attaining ambient air quality standards. *See, e.g.,* 42 U.S.C. §§ 7401 (state responsibility) and 7410 (state implementation plan).

57.    Under Section 110(a) of the Clean Air Act, 42 U.S.C. § 7410(a), states implement many of the regulatory requirements of the Clean Air Act under SIPs. SIP provisions must satisfy the requirements of the Clean Air Act before they are approved by EPA. 42 U.S.C. § 7410(k).

58.    Section 110 of the Act, 42 U.S.C. § 7410, provides that each state shall adopt and submit for EPA approval a SIP. The SIP is intended to implement, maintain, and enforce national primary and secondary air quality standards with respect to the specific needs of each state. *See*, *e.g.*, 42 U.S.C. § 7410(a)(2)(C) (explaining that each SIP shall provide for the "regulation of the modification and construction of any stationary source . . . to assure that national ambient air quality standards are achieved.").

59.    In general, SIPs consist of state laws, regulations, and permits and must provide for attainment and maintenance of the National Ambient Air Quality Standards. Once approved by EPA, SIPs become federal law and are enforceable by the state, EPA and citizens under the Clean Air Act. 42 U.S.C. § 7410 (approval of SIPs); 42 U.S.C. § 7604(f)(4) (enforceability of SIPs).

60.    Texas regulations that have been approved by EPA as part of the state's federally enforceable SIP are identified at 40 C.F.R. § 52.2270. Texas issues permits to new and modified sources of air pollution pursuant to 30 Tex. Admin. Code Chapter 116, which has been approved by EPA into Texas' SIP. 40 C.F.R. § 52.2270(c).

61.    In addition to the SIP program, the Clean Air Act's Title V provisions require major stationary sources of air pollution to obtain and periodically renew operating permits which must incorporate all applicable requirements, including those contained in SIP permits. 42 U.S.C. §§

7661-7661f. Conditions of Title V permits are enforceable by citizens under 42 U.S.C. § 7604(f)(4).

62.     Section 304(a) of the Clean Air Act, 42 U.S.C. §7604(a), authorizes citizens to bring suit for violation of any "emission standard or limitation" which is in effect under the Act.

63.     Section 304(f) of the Act, 42 U.S.C. §7604(f), defines "emission standard or limitation," to include any standard or limitation which is applicable under an approved SIP, any standard or limitation established under Title V, and any requirement under section 112 relating to HAPs.

64.     Pursuant to SIP rule 30 Tex. Admin. Code § 116.115, TCEQ issued SIP Permit No. 98014 to the Facility on February 1, 2012. TCEQ most recently amended SIP Permit No. 98014 on March 30, 2020.

65.     The Facility's current Title V Operating Permit, Federal Operating Permit No. O3609, issued September 17, 2015, incorporates by reference SIP Permit No. 98014.

66.      Woodville Pellets' SIP Permit specifies the volume and type of emissions allowed to be emitted by the Facility. The SIP Permit specifies that any emission in excess of permit limits, from emission points other than those identified in the permit and/or containing contaminants not listed in the permit are violations of the permit.

## VI.     FACTS

### A.    THE FACILITY AND ITS EMISSIONS

67.     Woodville Pellets manufactures wood pellets that are exported overseas to be burned as fuel in power plants.

68.     Woodville Pellets is designed to produce approximately 72 tons of pellets per hour and is authorized to operate continuously for 8,000 hours per year.

69.     The Facility's annual production capacity is approximately 576,000 tons per year.

70.     The Woodville Pellets Facility was constructed by German Pellets beginning in 2012 and began operating in 2013. Woodville Pellets LLC, a subsidiary of Estonia-based Graanul Invest, acquired the facility on June 18, 2019.

71.     The manufacturing process involves four main steps, each of which is a significant source of air pollution. First, wood is processed in green (or "wet") hammermills to produce small chips; second, the chips are dried in two large wood dryers heated by two industrial, wood-burning furnaces; third, the chips are again reduced in size in dry hammermills, producing "microchips;" finally, the microchips are pelletized in pellet presses, which raises the temperature of the wood significantly, requiring the use of pellet coolers.

72.     From the time the plant was constructed to the present, the Facility has operated several air pollution controls on the various units: the green hammermills, dry hammermills, and pellet coolers each are equipped with cyclones or baghouses for control of PM; these units have no controls to reduce VOC and HAP emissions. The furnaces and dryers vent emissions to a wet electrostatic precipitator for PM control and a regenerative thermal oxidizer ("RTO") for control of VOCs and HAPs.

73.     When German Pellets designed and constructed this facility in 2011 and 2012, the industrial wood pellet industry was less than a decade old, and knowledge of emissions, especially VOCs (and by extension, HAPs, because most HAPs at issue are also VOCs), was limited. German Pellets estimated the entire facility would emit just 64 tons of VOCs per year, and therefore sought and received a "minor" New Source Review permit pursuant to 30 Tex. Admin. Code §§ 116.110-116.128 rather than a "major" New Source Review permit pursuant to 30 Tex. Admin. Code §§ 116.160-169. The emissions threshold for triggering major New Source Review applicability for

this type of facility is 250 tons per year of any New-Source-Review-regulated air pollutant, which includes VOCs.

74.     In 2014, German Pellets began an audit of its emissions after testing at similar plants showed much higher than expected VOC emissions. In 2015, German Pellets admitted to TCEQ that the Facility actually emitted at least 580 tons of VOCs per year at full production. The additional 516 tons of VOCs were due to previously unknown emissions from the dry hammermills and pellet coolers. These units are frequently referred to as "post-dryer" units because they follow the dryer in the manufacturing process.

75.     As a result of the excess VOC emissions, German Pellets and TCEQ recognized that the Facility was emitting vastly higher levels of VOCs than permitted and also that the Facility should have been permitted as a major rather than minor source under the applicable New Source Review provisions.

76.     To remedy the noncompliance due to excess VOC emissions, German Pellets agreed to install an additional RTO control on the post-dryer units—the dry hammermills and pellet coolers—but had not begun construction of this control prior to selling the plant to Woodville Pellets.

77.     RTOs typically reduce VOC and HAP emissions from dry hammermills and pellet coolers by at least 95%. Accordingly, installation of an RTO on the post-dryer units would reduce Facility-wide VOC emissions to below the 250 ton-per-year major New Source Review threshold, enabling the Facility to avoid complying with major New Source Review requirements.

78.     As originally designed and as currently operated, each of the four dry hammermills and each of the two pellet coolers exhaust through individual stacks. With the proposed new RTO, all

of these stacks will be combined and controlled by the new RTO and emitted through a single new RTO stack.

79.     Woodville Pellets has not begun construction of the new RTO, but continues to operate the facility.

**B.     PERMITTING HISTORY**

80.     As the owner and operator of the Facility, Woodville Pellets LLC is in possession of permits issued by TCEQ which authorize a limited release of VOCs, HAPs, and other pollutants.

81.     Woodville Pellets is subject to the conditions of SIP Permit No. 98014, first issued in 2012 and most recently amended March 30, 2020.

82.     From the initial issuance of the SIP Permit until an April 5, 2019 permit amendment, the SIP Permit did not authorize any VOC or HAP emissions from the green hammermills, dry hammermills, and pellet coolers.

83.     The April 5, 2019 permit amendment authorized the construction of the new RTO, incorporated VOC limits for the new RTO, and implemented a facility-wide HAP limit. Neither the April 5, 2019 permit amendment nor the March 30, 2020 amendment authorize the individual dry hammermills and pellet coolers, nor the green hammermills, to emit any VOCs or HAPs.

**C.     PROHIBITIONS ON EXCESS EMISSIONS**

84.     Special Condition No. 1 of the SIP Permit states that "[t]his permit covers only those sources of emissions listed in the attached table entitled "Emission Sources—Maximum Allowable Emission Rates.""

85.     General Condition 8 of the SIP Permit states that "[t]he total emissions of air contaminants from any of the sources of emissions must not exceed the values stated on the table attached to the permit entitled "Emission Sources—Maximum Allowable Emission Rates.""

86.     Texas' federally-approved and federally-enforceable SIP provides that "[t]he total emissions of air contaminants from any of the sources of emissions at a facility must not exceed the values stated on the table attached to the permit." 30 Tex. Admin. Code § 116.115(b)(2)(F), most recently approved by EPA at 77 Fed. Reg. 65,119 (Oct. 25, 2012).

87.     In short, any emission of a contaminant that is (a) not listed in the Maximum Allowable Emission Rates ("MAER") table, (b) from a source not identified on the MAER table, or (c) in excess of the rates listed on the MAER table violates the SIP Permit and Texas' SIP. As set forth below, Woodville Pellet's emission of numerous air contaminants has exceeded and continues to exceed the authorized emissions set forth in the MAER table attached to Woodville Pellets' SIP Permit.

**D.     WOODVILLE PELLETS' EXCESS EMISSIONS**

*1.     Post-Dryer VOC Limits and Emissions.*

88.     The MAER table in the current version of the SIP Permit, as amended April 5, 2019 and March 30, 2020, only authorizes a combined VOC emission rate for the dry hammermills and pellet coolers—as controlled by the future RTO—of 6.55 lb/hr and 26.25 tons per year ("tpy") (on a 12-month rolling basis).

89.     That limit applies specifically to the new RTO stack, which has not yet been installed.

90.     The MAER table in the current version of the SIP Permit does not authorize any VOC emissions from the existing stacks that vent directly from the dry hammermills and pellet coolers.

91.     These units in fact emit substantial amounts of VOCs when in operation.

92.     Woodville Pellets, in response to a TCEQ investigation, recently referenced stack testing conducted in February 2015, which produced an emission factor of 1.491 lb/ton of pellets. With that emission factor, hourly and annual post-dryer emissions at maximum capacity are 107 lb/hr and 429 tpy, respectively.

93.     Alternatively, after German Pellets conducted its audit in 2014 and 2015, the company reported to TCEQ that the post-dryer emission rates from operations at full capacity are as follows:

| Post-Dryer VOC Emissions | | |
|---|---|---|
| Source | Pounds Per Hour | Tons Per Year |
| Dry Mill Ia | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Ib | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Ic | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Id | 4.32 lb/hr | 17.27 tpy |
| Cooler IIa | 55.77 lb/hr | 223.08 tpy |
| Cooler Iib | 55.77 lb/hr | 223.08 tpy |
| Total Emissions: | 128.82 lb/hr | 515.24 tpy |

94.     The rates reported by German Pellets to TCEQ are approximately 20% higher than the rates Woodville Pellets reported from the 2015 stack test.

    **2.    *Green Hammermill VOC Limits and Emissions.***

95.     Woodville Pellets operates seven green hammermills, permitted as Emission Points No. IIIa through IIIg. The SIP Permit has never authorized any VOC emissions from these units, including the most recently amended version of the permit.

96.     Information from other wood pellet plants demonstrates that green hammermills are a significant source of VOC emissions.

97.     For instance, most pellet plants that operate green hammermills and are permitted as synthetic minor sources for major New Source Review avoidance (i.e. pellet plants that must limit facility-wide VOC emissions to less than 250 tpy) utilize RTOs to control VOCs from their green hammermills.

98.     Based on information and belief, each facility that has conducted stack testing on their green hammermills has shown significant emission rates, as shown below:

| Stack Test Results for VOC Emissions for Green Hammermills | | | |
|---|---|---|---|
| Facility | Emission Factor (lb/oven dried ton) | Emissions at Woodville Pellets Assuming 72 tons/hour Production Rate and 8,000 hours/year | |
| | | Hourly | Annual |
| MRE Crossville | 0.58 | 41.8 lb/hr | 167 tpy |
| Enviva Amory | 0.29 | 20.9 lb/hr | 84 tpy |
| Enviva Sampson | 0.203 | 14.6 lb/hr | 58 tpy |
| Enviva Wiggins | 0.2 | 14.4 lb/hr | 58 tpy |

99.    There is no evidence in the permitting record for this Facility that Woodville Pellets' green hammermills operate any differently from or emit fewer VOCs than those at other plants, nor is there any plausible claim that Woodville Pellets' green hammermills emit zero VOCs.

### 3.    HAP Emissions and Limits

100.    The 2019 amendment to the SIP Permit included, for the first time, facility-wide limits on HAP emissions in the MAER table, limiting emissions of any individual HAP to less than 10 tpy and limiting the total HAP emissions to less than 25 tpy.

101.    Prior to the 2019 amendment, the SIP Permit only contained HAP limits for the dryer outlet RTO stack, meaning no other units were authorized to emit any HAPs.

102.    Neither German Pellets nor Woodville Pellets have conducted any emissions testing to demonstrate compliance with limits on HAP emissions.

103.    The most comprehensive set of emission factors for this industry, however, show that Woodville Pellets' HAP emissions greatly exceed the 10 and 25 tpy limits in the 2019 SIP Permit.

104.    Enviva, the largest wood pellet manufacturing company in the world with eight existing plants, has developed emission factors for pellet plants comparable to the Woodville Pellets Facility based on numerous tests at its various facilities.

105.    Enviva recently reported, based on those emission factors, that a pellet plant comparable to Woodville Pellets emits 149 tpy of total HAPs.

106.    Specifically, applying the Enviva emission factors to Woodville Pellets' operations (at full capacity) show the following emission rates:

| Woodville Pellets Facility-Wide HAP Emissions | | |
|---|---|---|
| Pollutant | Emission Factor (lb/oven dried ton) | Annual Emissions at Full Capacity (576,000 tpy) |
| Total HAPs | 0.454 | 130 tpy |
| Methanol | 0.252 | 72.8 tpy |
| Acrolein | 0.064 | 18.4 tpy |
| Formaldehyde | 0.043 | 12.3 tpy |
| Phenol | 0.033 | 9.6 tpy |
| Propionaldehyde | 0.029 | 8.4 tpy |
| Acetaldehyde | 0.022 | 6.3 tpy |

### 4.    *Dryer and Furnace Bypass Emissions and Limitations*

107.    Woodville Pellets' two furnaces and two wood dryers each feature a bypass stack (for a total of four bypass stacks) that, when used, emit air contaminants directly to the atmosphere rather than to the existing pollution controls and the authorized emission point (the authorized emission point is permitted as Emission Point IV, "Dryers 1 and 2 WESP and RTO Stack").

108.    None of the four bypass stacks is listed in the MAER table as an authorized emission point, and therefore emissions of any pollutants from these stacks are unauthorized.

109.    When Woodville Pellets utilizes the bypass stacks, the Facility emits VOCs, HAPs, PM, nitrogen oxides, carbon monoxide, and sulfur dioxide through the bypass stacks rather than through the existing, effective pollution control technology installed on the furnaces and dryers.

110.    Without the use of the pollution control technology, emissions of VOCs and HAPs from the furnaces and dryers are approximately 20 times higher than normal operations, and PM emissions are approximately 100 times higher than normal operations.

111.    Woodville Pellets has utilized its bypass stacks on dozens of occasions since acquiring the Facility.

E.    **WOODVILLE PELLETS' OPERATING AND PRODUCTION INFORMATION**

112.    The precise quantity of Woodville Pellets' excess emissions (other than from bypass events) is dependent on the facility's production rate, in that higher production rates directly cause higher emissions.

113.    Woodville Pellets has not made the facility's actual production rates public, other than one report to TCEQ wherein Woodville Pellets states that between April 5, 2019 and January 31, 2020, the facility produced 341,388 tons of pellets. This number was not broken down into hourly, daily, or monthly rates, but works out to an average of 34,501 tons per month, 1,134 tons per day, and 47 tons per hour.

114.    Separately, German Pellets reported emission rates to TCEQ covering the period between November 2018 (when the plant restarted operations after being idled for more than a year) and April 2019 indicating the facility had produced approximately 117,155 tons of pellets during that period.

115.    Although Plaintiffs do not have access to more refined production rates, those records are maintained by Woodville Pellets.

## VII.    CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF FEDERAL AND STATE PERMITTING REQUIREMENTS FOR UNAUTHORIZED VOC EMISSIONS FROM THE DRY HAMMERMILL AND PELLET COOLER UNITS

116.    The Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 115, as if the same were repeated verbatim herein.

*1.    The Facility is not authorized to emit any VOCs from the Hammermill and Pellet Cooler Units.*

117.    The April 5, 2019 SIP Permit Amendment authorizing VOC emissions from the post-dryer units applies only to the RTO emission point; this emission point does not yet exist.

118.    No version of the SIP Permit, including the April 9, 2019 SIP Permit nor the most recent March 30, 2020 SIP Permit, has ever authorized the four individual dry hammermills and two pellet cooler stacks to emit VOCs.

119.    Accordingly, all VOC emissions from the dry hammermills and pellet coolers are unauthorized and constitute violations of Special Condition No. 1 and General Condition No. 8 of Permit 98014 and the Texas SIP, 30 Tex. Admin. Code § 116.115(b)(2)(F).

120.    As discussed above in paragraphs 91-93, both the dry hammermills and pellet coolers in fact emit significant amounts of VOCs. At the full production capacity of 72 tons per hour, the pellet coolers and dry hammermills emit 2,574 pounds of VOCs per day based on the emission factor from the 2015 stack test.

121.    Each day Woodville Pellets has operated any of the four dry hammermills (permitted as Emission Point Nos. Ia, Ib, Ic, and Id, and alternatively as Source Name: Dry Mill Filter No. 1 through 4 Baghouse Stacks) since acquiring the plant on June 18, 2019, and each day Woodville Pellets continues to operate any of these dry hammermill units, is an individual violation. Operation of each individual dry hammermill is an individual violation.

122.    Each day Woodville Pellets has operated either or both of the two pellet coolers (permitted as Emission Point Nos. IIa and IIb, and alternatively as Source Name: Cooler Air Aspiration Filter No. 1 and No.2 Baghouse Stack) since acquiring the plant on June 18, 2019, and each day Woodville Pellets continues to operate either or both of these pellet cooler units, is an individual violation. Operation of each individual pellet cooler is an individual violation.

123.    Although Plaintiffs do not have access to precise production data, at a minimum Woodville Pellets reported to TCEQ that the facility produced 341,388 tons of pellets between April 5, 2019 and January 31, 2020, which equates to an average pellet production rate of 1,134 tons per day.

124.    Upon information and belief, Woodville Pellets has operated these post-dryer units on a continuing basis since January 31, 2020.

125.    Upon discovery of the specific operating information for these post-dryer units, known to Woodville Pellets, Plaintiffs will be able to determine the dates that these specific violations have occurred.

### 2. In the alternative, if the new RTO Stack limits apply, the Facility has exceeded its VOC emission limits for the Hammermill and Pellet Cooler Units on numerous occasions.

126.    Alternatively, if the MAER limits applicable to the yet-to-be-constructed RTO stack set forth in the in the April 2019 version of the Facility's SIP Permit – an hourly limit of 6.55 lb/hr and annual limit of 26.25 tpy (on a 12-month rolling basis) – are considered applicable to emissions vented directly from the Facility's dry hammermill and pellet cooler stacks, Woodville Pellets has exceeded these limits and will continue to do so if the Facility continues operating.

### a. The Facility has exceeded its annual limit for the post-dryer units if the RTO Stack limits apply.

127.    Based on the emission factors reported from the 2015 stack testing, each month the Facility's rolling 12-month pellet production rate exceeds or has exceeded 35,212 tons, Woodville Pellets emits and has emitted VOCs in quantities that exceed the annual MAER VOC limit of 26.25 tpy.

128.    Specifically, the 2015 stack testing produced an emission factor for all of the post-dryer units of 1.491 pounds of VOC emissions for every ton of pellets produced. Therefore, when the facility produces 35,212 tons of pellets in a 12-month period, the post-dryer units emit 26.25 tons of VOCs.

129.    Based on emissions information provided by German Pellets to TCEQ, when Woodville Pellets acquired the plant in June 2019, the facility's rolling 12-month production rate was at least 117,244 tons based on production between November 2018 and April 2019.

130.    The facility then produced 341,388 tons of pellets between April 5, 2019 and January 31, 2020, an average of 34,501 tons per month.

131.    Upon information and belief, Woodville Pellets has continued to operate at similar or higher production rates since January 31, 2020.

132.    Based upon the foregoing, Woodville Pellets' 12-month rolling production rate has vastly exceeded 35,212 tons in each month since Woodville Pellets acquired the plant on June 18, 2019.

133.    Therefore, Woodville Pellets has violated the annual MAER VOC limit each month since acquiring the plant and will continue to violate the annual MAER VOC limit each month the facility's 12-month rolling production rate exceeds the 35,212 tpy threshold.

**b.    The Facility has routinely exceeded its hourly limit for both post-dryer units if the RTO Stack limits apply.**

134.    Based on the emission factors from the 2015 stack test, each day that the post-dryer units produce or have produce more than 4.39 tons in any single hour, Woodville Pellets' post-dryer VOC emissions exceed the 6.55 lb/hour limit on VOCs emissions.

135.    Specifically, the 2015 stack testing produced an emission factor for all of the post-dryer units of 1.491 pounds of VOC emissions for every ton of pellets produced. Therefore, whenever the post-dryer units produce 4.39 tons of pellets in one hour, the post-dryer units emit 6.55 pounds of VOCs.

136.    Based on information and belief, the Facility produces far more than 4.39 tons of pellets per hour every hour that it operates under normal circumstances. For instance, the average hourly

production rate between April 5, 2019 and January 31, 2019 was 47 tons per hour, and the facility has the capacity to produce up to 72 tons per hour.

137.    As a result, between acquiring the plant and the date of filing, Woodville Pellets has violated the hourly emission limit for VOCs in SIP Permit No. 98014 for thousands of hours based on its operations of the Dry Hammermill and Pellet Cooler Units.

138.    Each day the Facility has operated these units at a production rate greater than 4.39 tons per hour is an individual violation.

139.    Woodville Pellets has not publicly reported the actual tonnage of pellets the facility has produced on an hourly basis since acquiring the plant, therefore Plaintiffs are unable to provide each specific date of violation.

140.    However, upon discovery of the operating information, known to Woodville Pellets, Plaintiffs will be able to determine the dates that these specific violations have occurred.

>   **3.    Relief requested to redress Count One (applicable to each asserted claim under this Count, including the alternative claim)**

141.    As described above, Woodville Pellets has repeatedly exceeded the hourly and annual emission standards for VOCs in the Facility's SIP Permit based on its operations of the Dry Hammermill and Pellet Cooler Units. These exceedances violate SIP Permit No. 98014.

142.    Defendant's violations of its SIP Permit, the Texas SIP, and the Act are continuing and/or intermittent.

143.    Because of this extensive history of violations, Plaintiffs believe and allege that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

144.    Woodville Pellets is subject to an injunction ordering it to cease its violations of its SIP Permit, the Texas SIP, and the Act.

145.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

146.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable, each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiffs' notice of intent to sue.

## COUNT TWO:  UNLAWFUL VOC EMISSIONS FROM THE GREEN HAMMERMILL UNITS

147.    The Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 146, as if the same were repeated verbatim herein.

148.    The SIP permit does not authorize any VOC emissions from the seven green hammermills.

149.    Because the green hammermills are a significant source of VOCs as described in paragraphs 96-99, each day the plant has operated or operates the green hammermills, Woodville Pellets violates and has violated Special Condition No. 1 and General Condition No. 8 of the SIP Permit and the Texas SIP itself, 30 Tex. Admin Code § 116.115(b)(2)(F).

150.    Operation of each of the seven green hammermills (permitted as Emission Point Nos. IIIa through IIIg, and alternatively as Source Name: Wet Mill Aspiration Cyclone No. 1 through 7 Stacks) is an individual violation.

151.    Defendant's violations of its SIP Permit, the Texas SIP, and the Act are continuing and/or intermittent.

152.    Because of this extensive history of violations, Plaintiffs believe and allege that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP and the Act.

153.    Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act.

154.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

155.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiffs' notice of intent to sue.

### COUNT THREE: VIOLATIONS OF PERMIT LIMITS ON FACILITY-WIDE HAP EMISSIONS

156.    The Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 155, as if the same were repeated verbatim herein.

*1.  The Facility has exceeded its Facility-wide HAP emission limits.*

157.    The April 5, 2019 SIP Permit Amendment instituted facility-wide limits on total HAP emissions (25 tpy) and individual HAP emissions (10 tpy) for the purpose of restricting the Facility's emissions to below the "major source" level set forth in Clean Air Act § 112(a)(1), 42 U.S.C. § 7412(a)(1).

158.    These limits apply facility-wide and on a 12-month rolling basis.

159.    Using the Enviva emission factors discussed above in paragraphs 104-106, based on information and belief, Woodville Pellets exceeds the 25 tpy total HAP limits whenever it produces 111,000 tons of pellets or more in a 12-month period.

160.    Based on the same Enviva emission factors, the Facility also exceeds the individual HAP limit of 10 tpy whenever 12-month production rates equal or exceed the following amounts: methanol emissions exceed 10 tpy at a production rate of 80,000 tpy, acrolein emissions exceed 10 tpy at a production rate of 315,000 tpy, and formaldehyde emissions exceed 10 tpy at a production rate of 475,000 tpy.

161.    Each month the Facility's rolling 12-month production of pellets exceeds or has exceeded any of these production rates, Woodville Pellets violates and has violated the total and/or individual annual HAP limits in Permit 98014, Special Condition No. 1 and General Condition No. 8 of the SIP Permit, and 30 Tex. Admin. Code § 116.115(b)(2)(F).

162.    As noted above, Woodville Pellets has a production capacity of approximately 576,000 tpy.

163.    While Plaintiffs do not have access to precise production rates, production records submitted to the TCEQ by Woodville Pellets for the period of April 5, 2019 through January 31, 2020 (wherein the facility produced a total of 341,388 tons of pellets during that period) show that, at a minimum, Woodville Pellets has exceeded the MAER limit on total HAPs and the individual HAP limit for methanol and acrolein.

164.    Upon information and belief, the Facility has continued operating and producing pellets each month since January 31, 2020.

165.    Upon information and belief, the Facility's 12-month rolling production has exceeded 111,000 tons in each month from April 2019 (inclusive) to the present.

166.    Upon information and belief, the Facility's total HAP emissions has exceeded the 25 tpy limit on total HAP in each month from June 2019 (inclusive) to the present.

167.    Upon discovery of more specific operating information and production rates for the Facility, known to Woodville Pellets, Plaintiffs will be able to identify the specific dates of Defendant's violations of the facility-wide HAP limits for individual HAPs.

### 2. In the Alternative, if the Facility-Wide HAP limits do not apply, the Facility has exceeded its HAP Emission Limits for the Green Hammermill, Dry Hammermills, and Pellet Cooler Units.

168.    Alternatively, if the facility-wide 10 tpy and 25 tpy limits do not apply under the theory that those limits are premised on the installation of the new RTO control, then the green hammermills, dry hammermills, and pellet coolers are not authorized to emit *any* amount of HAPs.

169.    Each of the units listed in the previous paragraph emit significant amounts of individual HAPs, specifically acetaldehyde, acrolein, formaldehyde, methanol, phenol, and propionaldehyde.

170.    Because each of these units in fact emits significant levels of the individual HAPs listed in previous paragraph, each day Woodville Pellets operates and has operated these units it violates and has violated Special Condition No. 1 and General Condition 8 of the SIP Permit and the Texas SIP, 30 Tex. Admin. Code § 116.115(b)(2)(F).

171.    Emissions of each individual HAP from each individual unit is an individual violation.

### 3. Relief requested to redress Count Three (applicable to each asserted claim under this count, including the alternative claim)

172.    Because of this extensive history of violations, Plaintiffs believe and allege that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

173.    Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act.

174.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

175.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable, each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiffs' notice of intent to sue.

**COUNT FOUR:  VIOLATIONS OF THE SIP PERMIT RELATED TO UNAUTHORIZED RELEASE OF POLLUTANTS THROUGH THE BYPASS STACKS**

176.    The Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 175, as if the same were repeated verbatim herein.

177.    Woodville Pellets is in violation of Special Condition No. 1 and General Condition No. 8 of the SIP Permit and the Texas SIP itself, 30 Tex. Admin Code § 116.115(b)(2)(F) each time it utilizes and has utilized the dryer and furnace bypass stacks to release emissions.

178.    Based on information and belief, these releases have occurred on or about the dates specified in the table below with a designation of which type of bypass stack Woodville Pellets utilized:

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| July 5, 2019 | X | |
| July 6, 2019 | X | |
| July 9, 2019 | X | |
| July 13, 2019 | | X |

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| July 15, 2019 | | X |
| July 24, 2019 | X | |
| July 25, 2019 | X | |
| July 31, 2019 | X | |
| August 2, 2019 | X | |
| August 5, 2019 | X | |
| August 6, 2019 | X | |
| August 9, 2019 | X | |
| September 19, 2019 | X | X |
| September 20, 2019 | X | X |
| September 22, 2019 | | X |
| October 18, 2019 | X | X |
| November 11, 2019 | | X |
| December 29, 2019 | X | X |
| January 3, 2020 | X | |
| January 6, 2020 | X | X |
| January 7, 2020 | | X |
| January 9, 2020 | X | X |
| January 10, 2020 | | X |
| January 21, 2020 | X | X |
| January 22, 2020 | X | |
| January 29, 2020 | | X |
| February 6, 2020 | X | X |
| February 7, 2020 | | X |
| February 9, 2020 | | X |
| February 10, 2020 | | X |
| February 16, 2020 | X | X |
| February 17, 2020 | | X |

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| February 18, 2020 | X | |
| March 1, 2020 | X | |
| March 16, 2020 | X | X |
| March 17, 2020 | X | |
| March 21, 2020 | X | |
| April 28, 2020 | | X |
| May 24, 2020 | X | X |
| June 11, 2020 | X | X |
| June 8, 2020 | | X |
| July 6, 2020 | X | |
| August 14, 2020 | X | |

179.    Upon discovery of more specific operating information for the Facility, known to Woodville Pellets, Plaintiffs will be able to determine additional dates which indicate release of emissions via the dryer or furnace bypass stacks.

180.    Because of this extensive history of violations, Plaintiffs believe and allege that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

181.    Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act by utilizing the dryer bypass stack or the furnace bypass stack.

182.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

183.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiffs' notice of intent to sue.

### COUNT FIVE:  VIOLATION OF SIP RULE 30 TEX. ADMIN. CODE § 101.4 RELATED TO BYPASS STACK RELEASES

184.    The Plaintiffs hereby reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 183, as if the same were repeated verbatim herein.

185.    The Texas SIP, as approved by the EPA, states:

> No person shall discharge from any source whatsoever one or more air contaminants . . . in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property, or as to interfere with the normal use and enjoyment of animal life, vegetation, or property.

30 Tex. Admin. Code § 101.4, approved by EPA into Texas' SIP at 37 Fed. Reg. 10,895 (May 31, 1972).

186.    Since it acquired the Facility in June 2019, when Woodville Pellets uses the Facility's bypass stacks, it emits PM, smoke, soot, and wood dust into the surrounding community. These emissions "adversely affect" human health and welfare and interfere with normal use and enjoyment of nearby properties, including Stafford's property

187.    On the dates listed above in Paragraph 178 the Facility emitted PM, smoke, soot, and wood dust from the bypass stacks which interfered with neighbors' normal use and enjoyment of their property and adversely affected human health and welfare.

33

188.     Discovery into Defendants' operating records may reveal additional dates in which the Facility utilized its bypass stacks – either the furnace bypass stacks or dryer bypass stacks – thereby adversely affecting human health and welfare and interfering with the normal use an enjoyment of nearby properties.

189.     Residents have documented visible smoke on their property during these events and have ceased recreating outdoors during such events to avoid breathing harmful emissions.

190.     Additionally, residents' properties have been repeatedly coated in dust and soot from these events.

191.     Further, Residents reasonably believe that their property values will be substantially impacted if these events continue to occur with the frequency and duration observed in the past year.

192.     These harms constitute a violation of the SIP's prohibition of emitting air pollution that is "injurious to or to adversely affect human health or welfare, animal life, vegetation or property, or as to interfere with the normal use and enjoyment of animal life, vegetation, or property." 30 Tex. Admin. Code § 101.4.

193.     All of these interferences cannot be dismissed as "trifles" or "petty annoyances" but rather must be understood to destroy the comfort of persons owning and occupying neighboring properties. Under these circumstances, these interferences with the use and enjoyment of Plaintiffs' land are unreasonable.

194.     As a direct result of these interferences, Plaintiff Stafford and Sierra Club's Members have sustained actual damages as a result of the injury to them individually and their ability to use and enjoy their property.

195.    Moreover, despite the Facility's existence since 2012, Woodville Pellets' operation of the Facility beginning in the Summer of 2019 is a change in ownership that constitutes a change in conditions at the Facility.

196.    Further, based on information and belief, the prior operator, German Pellets was not utilizing the bypass stacks in this manner in a way that was injurious to or adversely affected human health or welfare, animal life, vegetation or property and interfered with the normal use and enjoyment of animal life, vegetation, or property in violation of Texas SIP Rule, 30 Tex. Admin. Code § 101.4.

## VIII.    EXHIBITS

197.    Plaintiffs attach and incorporate by reference the following exhibits identified in this Complaint:

Exhibit A        Notice of Intent to Sue

Exhibit B        Certified Mail Receipts for Notice of Intent to Sue

## IX.    JURY DEMAND

198.    Plaintiffs, by and through the undersigned, hereby demand a trial by jury on all issues triable under law.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs pray for judgment against Defendant based on the following prayer:

(a) Declare that Defendant has violated and is in continuing violation of its SIP Permit No. 98014, the Texas SIP, and the Clean Air Act and its applicable regulations;

(b) Permanently enjoin Defendant from operating its Facility in Woodville, Texas in such a manner that will result in further violations its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations;

(c) Order Woodville Pellets to comply with all emission standards and limitations of its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations;

(d) Order the Defendant to take appropriate actions to remedy, mitigate or offset the harm to public health and the environment caused by the violations of the Clean Air Act and its applicable regulations alleged above;

(e) Assess a civil penalty against Defendant of up to $101,430 per day for each violation of its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations, as provided by 42 U.S.C. §§ 7413(e) and 7604(a) and (g), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 and 40 C.F.R. § 19.4;

(f) Order Defendants to pay Plaintiffs' reasonable attorney's fees and costs (including expert witness fees and costs) as provided by 42 U.S.C. § 7604(d);

(g) Award Plaintiffs their costs of suit as provided by 42 U.S.C. § 7604(d);

(h) Award pre- and post-judgment interest at the highest rates recoverable under applicable law; and

(i) Grant Plaintiffs any such other and further relief as the Court deems just and proper.

Dated: August 18, 2020.

Respectfully submitted,

*/s/ Patrick J. Anderson*
Patrick J. Anderson (Lead)
*Pro hac vice motion to be filed*
Georgia State Bar No. 226260
Environmental Integrity Project
315 W. Ponce de Leon Ave, Suite 842
Decatur, GA 30030
Tel: (719) 963-4072
Fax: (470) 387-0841
panderson@environmentalintegrity.org

Keri N. Powell
*Pro hac vice motion to be filed*
Georgia State Bar No. 437963
Environmental Integrity Project
315 W. Ponce de Leon Ave, Suite 842
Decatur, GA 30030
Tel: (678) 902-4450
Fax: (470) 387-0821
kpowell@powellenviornmentallaw.com

**ATTORNEYS FOR PLAINTIFF
SIERRA CLUB**

*/s/ Amy Catherine Dinn*
Amy Catherine Dinn
Texas State Bar No. 24026801
**LONE STAR LEGAL AID**
P.O. Box 398
Houston, Texas 77001-0398
Phone: (713) 652-0077 ext. 1118
Fax: (713) 652-3141
adinn@lonestarlegal.org

**LEAD ATTORNEY FOR
PLAINTIFF DUSTIN STAFFORD**