**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| SIERRA CLUB, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 9:20-cv-00178 |
| | § | JUDGE MICHAEL TRUNCALE |
| | § | |
| WOODVILLE PELLETS, LLC, | § | JURY DEMANDED |
| | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Sierra Club ("Sierra Club" or "Plaintiff") files this Second Amended Complaint[1] (the "Second Amended Complaint") against Woodville Pellets, LLC ("Woodville Pellets" or "Defendant") and in support show the following:

## I.    NATURE OF ACTION

1.    Plaintiff brings this action against Woodville Pellets under the citizen suit provision of the Federal Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq.* (the "Clean Air Act" or the "Act"). 42 U.S.C. § 7604.

2.    This suit relates to continuing and past violations of the Clean Air Act at Woodville Pellets' wood pellet manufacturing facility at 164 County Road 1040, Woodville, Texas 75979 (the "Facility").

---

[1] Counsel for Defendant Woodville Pellets provided written consent pursuant to Federal Rule of Civil Procedure 15(a)(2) authorizing Plaintiff Sierra Club to file this Second Amended Complaint.

3.     As a necessary byproduct of wood pellet production, the Facility emits large amounts of volatile organic compounds ("VOCs"), particulate matter ("PM"), hazardous air pollutants ("HAPs"), nitrogen oxides, sulfur dioxide, and carbon monoxide. These emissions are subject to regulation under State Implementation Plan ("SIP") Permit No. 98014.

4.     The Facility has been out of compliance with the Clean Air Act and Texas' federally enforceable SIP each day it has operated since it began operating in 2013.

5.     First, the Facility's key units emit more than 500 tons of unpermitted VOCs per year and dozens of tons of unpermitted HAPs per year when operating. The Facility's previous owner acknowledged the excess VOC emissions in 2015 and, in 2018, agreed to install additional air pollution control technology to remedy the noncompliance. Instead of bringing the plant into compliance as quickly as possible after acquiring the plant on June 18, 2019, however, Woodville Pellets will not even *begin* construction of the air pollution controls needed to achieve compliance with VOC and HAP limits until April 2022. Further, Woodville Pellets has not committed to a firm date for when the control will be installed and operating. Without that additional control technology installed and operating, the Facility continues to violate the Clean Air Act and the Texas SIP each day it operates.

6.     Second, since acquiring the Facility, Woodville Pellets has utilized "bypass stacks" on dozens of occasions to circumvent existing and effective air pollution controls that reduce emissions from the Facility's furnaces and wood dryers. The Facility's SIP Permit does not authorize use of these bypass stacks. When Woodville Pellets uses the bypass stacks, it emits large amounts of PM, VOCs, HAPs, nitrogen dioxides, carbon monoxide, sulfur dioxide, smoke, and soot from the Facility's furnaces and wood dryers directly to the atmosphere. These releases from

uncontrolled and unpermitted bypass events often last many hours, harming the health and welfare of the surrounding community.

7.      Finally, Woodville Pellets allowed the Facility's Federal Operating Permit, also known as a Clean Air Act Title V Permit (the "Title V Permit"), to expire on September 17, 2020. Under federal Title V regulations, "[p]ermit expiration terminates the source's right to operate." 40 C.F.R. § 70.7(c)(1)(ii). Despite expiration of the Title V Permit and the legal requirement to cease operations, Woodville Pellets has continued and is continuing to operate without a new Title V Permit.

8.      By this suit, Plaintiff seeks injunctive relief, imposition of civil penalties, and associated costs of the litigation (including court costs, attorney's fees, and expert witness fees and costs) for the Defendant's repeated violations of emissions standards in its permit issued pursuant to Sections 110 and 112 of the Clean Air Act, 42 U.S.C. §§ 7610, 7412, and for the Defendant's operation of the Facility without a Title V operating permit in violation of Section 502(a) of the Act, 42 U.S.C. § 7661a(a).

## II.      PARTIES

### A.      PLAINTIFF

9.      Plaintiff Sierra Club sues on behalf of its members. The Sierra Club is a non-profit public interest organization organized under the laws of the State of California, with its principal offices in San Francisco, California. The Lone Star Chapter is dedicated to protecting Texas' natural resources, the health of its people, and preserving the state's many beautiful and unique natural landscapes. In this matter, the Sierra Club seeks to protect the air quality in and around Woodville, and to protect its members' health and their ability to safely pursue and enjoy outdoor activities in the Woodville area.

10.     Sierra Club's members reside, own property, breathe the air, and/or use areas near the Facility in Woodville, Texas. They use and enjoy the benefits of natural resources into which Defendant has emitted, and continues to emit, air pollutants, including substantial levels of unpermitted PM, VOCs, HAPs, smoke, soot, and wood dust. The interests of the individual citizens and Sierra Club's members have been, are being, and will be adversely affected by Defendant's emission of pollutants into the air in violation of its SIP Permit and of federally enforceable air pollution standards.

**B.     DEFENDANT**

11.     Defendant Woodville Pellets, LLC is a limited liability company organized under the laws of the State of Delaware. Woodville Pellets, LLC has appeared and answered this suit. Since June 18, 2019, Woodville Pellets has owned and operated the wood pellet manufacturing facility at issue after it purchased the Facility from the previous owner and operator, German Pellets Texas, LLC ("German Pellets").

12.     Woodville Pellets is a "person" within the meaning of Section 302(e) of the Clean Air Act. 42 U.S.C. § 7602(e).

**C.     SERVICE TO OTHER REQUIRED PARTIES**

13.     The U.S. Attorney General and the U.S. EPA Administrator will be served with a copy of this Second Amended Complaint as required by the citizen suit provisions of the Clean Air Act. 42 U.S.C. § 7604(c)(3).

**D.     EFFECTS OF WOODVILLE PELLETS' UNPERMITTED AIR POLLUTION ON PLAINTIFF'S MEMBERS**

14.     Woodville Pellets operates its Facility in Woodville, Texas, which has an estimated population of 2,614 and covers approximately 3.21 square miles for its city limits.

15.    The Facility is the only regulated facility in the Woodville area that emits significant quantities of PM, VOCs, HAPs, nitrogen oxides, and carbon monoxide.

16.    Woodville Pellets is subject to regulatory limitations imposed by SIP Permit No. 98014, which lists the type and amount of air pollutants the Facility is allowed to release, while establishing that any air contaminant not named in the permit, or those in excess of the limits established therein or from emission points other than those authorized therein, are strictly prohibited from being emitted in any volume. These emission restrictions mitigate the potential adverse health and environmental impacts of the Facility's air pollution on the surrounding community.

17.    VOCs are gases which may adversely affect the health of those exposed to them in the short- and long-term. VOCs combine with nitrogen oxides and sunlight to create ground-level ozone and smog; breathing ground-level ozone is harmful for any person, but especially for the elderly, children, and those with health issues like asthma. VOCs also directly cause breathing difficulty and irritation to the respiratory system. Finally, VOCs encompass many harmful toxic or carcinogenic pollutants that are also regulated as HAPs, discussed below.

18.    Defendant's unlawful emissions of excess VOCs into the air contributes to elevated levels of VOCs, ground-level ozone, and smog in the area surrounding Defendant's Facility, including greater Woodville. Sierra Club's members have repeatedly and intermittently suffered injury from the Facility's unlawful VOC pollution since it began operating in 2013 and since Defendant acquired the Facility in June 2019.

19.    HAPs, also known as air toxics, are those substances which are known or suspected to cause cancer, or other serious health side effects such as birth defects. Specifically, HAPs are pollutants that the U.S. Congress has listed as toxic or carcinogenic even in small quantities. HAPs

emitted from wood pellet processing facilities include acetaldehyde, acrolein, formaldehyde, hydrochloric acid, methanol, phenol, and propionaldehyde.

20.     The Facility's current SIP Permit limits emissions of any single HAP to no more than 10 tons per year and limits total HAP emissions to no more than 25 tons per year. The purpose of these limits is to restrict the Facility's emissions to below the "major source" level set forth in Clean Air Act § 112(a)(1), 42 U.S.C. § 7412(a)(1), thereby enabling the Facility to avoid more stringent HAP control requirements. The Facility is currently exceeding these emission limits on HAPs.

21.     These excess emissions of HAPs into the air contribute to elevated levels of HAPs in the area surrounding the Facility. Sierra Club's members have repeatedly and intermittently suffered injury from the Facility's unlawful HAP pollution since the facility began operating in 2013 and since Defendant acquired the Facility in June 2019.

22.     However, neither Woodville Pellets, nor the prior owner German Pellets, has conducted any emissions testing to demonstrate compliance with limits on HAP emissions.

23.     The most reliable testing from this industry indicates that the Facility has the potential to emit HAPs at rates far higher than the 10 and 25 ton per year limits. Specifically, Enviva, the largest pellet company in the world, released information based on stack tests at numerous comparable pellet plants that indicate a facility the size of Woodville Pellets emits around 130 tons of total HAPs per year, including 83 tons per year of methanol, 21 tons per year of acrolein, 14 tons of formaldehyde, and many other HAPs at lower rates.

24.     Based on Enviva's comparable emissions data, the Facility has exceeded the applicable limits of 10 tons per year of any individual HAP and 25 tons per year of total HAP on a regular basis and will continue to do so until it installs additional control technology.

25.     The Facility produces both visible air pollution, in the form of smoke, soot, and dust, as well as odors and unseen air pollution.

26.     Several Sierra Club members reside within 4,000 feet of the facility and frequently observe these visible emissions and smell odors they believe are emitted from the Facility. During normal operations, the facility's steam plume often passes directly over the homes of these Sierra Club members.

27.     Since Defendant acquired the Facility on June 18, 2019, Sierra Club members have personally witnessed and documented many "bypass" events when Woodville Pellets emits visible and invisible air pollution directly from its furnaces and wood dryers rather than sending emissions to existing air pollution controls, in violation of the Facility's SIP Permit.

28.     When these bypass events occur, visible emissions of PM, smoke, soot, and wood dust from the Facility often migrate into the surrounding community, including the homes and properties of Sierra Club's members.

29.     Even outside of bypass events, Sierra Club members often observe hazy skies in the Woodville region.

30.     Sierra Club's members smell smoke and chemical odors from the Facility both during these bypass events and frequently also during normal operations.

31.     Sierra Club's members in Woodville are aware that air pollutants of the type emitted by Woodville Pellets are associated with adverse health effects. Sierra Club members have reasonable fears that Woodville Pellets' unauthorized emissions of these pollutants threatens their health. Sierra Club members with preexisting respiratory issues such asthma or sensitivity to allergies are especially concerned because exposure to air pollution can aggravate such conditions.

32.     Because of their fears about Woodville Pellets' excess and unlawful emissions, Sierra Club members frequently refrain from outdoor recreation or yardwork that they would otherwise do and enjoy.

33.     Plaintiff's members have been injured by Woodville Pellets' unpermitted and uncontrolled release of pollution into the atmosphere. These injuries include, but are not limited to, pollution of their real and personal property, exposure to unhealthy air pollutants, and fear that the Facility's unlawful pollution will adversely impact their health and the health of their family members.

34.     Sierra Club's members near the plant have an interest in seeing the Facility's violations of its SIP Permit, the Texas SIP, and the Act prosecuted so as to preserve their right to the enjoyment of their homes and land without interference and to safeguard their health.

35.     Based on the authority provided under the Clean Air Act for the Court to issue injunctive relief to prevent emissions in excess of permitted limits, a favorable decision by this Court will force Woodville Pellets to cease, desist, and abate unpermitted air pollution from its Woodville, Texas Facility. Imposition of civil penalties would likewise discourage Woodville Pellets from engaging in future activities that result in the Facility's release of unpermitted air pollution.

**E.     EFFECTS OF WOODVILLE PELLETS' CONTINUED OPERATIONS WITHOUT A TITLE V PERMIT**

36.     In 1990, Congress enacted Title V of the Clean Air Act to address widespread noncompliance issues at large sources of air pollution around the nation. The key feature of Title V is the requirement that major sources of air pollution like Woodville Pellets must obtain and operate according to a Title V permit, also known as a Federal Operating Permit. These permits must be written in manner such that they assure compliance with each applicable requirement of the Clean Air Act, including requirements contained in SIP permits.

37.    To assure compliance with the Clean Air Act, Title V permits must contain adequate monitoring, recordkeeping, and reporting requirements to ensure the source complies with each applicable requirement of the Clean Air Act.

38.    Likewise, the Title V program requires that sources submit semiannual deviation reports and annual compliance certifications. These reports and certifications are designed so that sources, regulatory agencies, and the public may identify and remedy instances of noncompliance.

39.    If a facility is not in compliance with an applicable requirement at the time of permit issuance, the facility's Title V permit must include a remedial compliance schedule. Such schedule shall include enforceable measures leading to compliance. A compliance schedule is supplemental to, and does not sanction noncompliance with, the applicable requirements on which it is based.

40.    Title V permits are issued for a term of no more than five years, and sources must apply to renew their Title V permit at least six months prior to permit expiration. At the time of application, a permit applicant must either certify that the facility is in full compliance with all applicable requirements, or identify areas of noncompliance and provide a proposed compliance schedule that will bring the facility into full compliance.

41.     Woodville Pellets' Title V Permit, Federal Operating Permit No. O3609, which was issued on September 17, 2015, expired on September 17, 2020 without being renewed.

42.    Because Defendant's Title V Permit has expired, Defendant is no longer authorized to operate the Facility. Plaintiff's members are harmed by all of the air pollution emitted by the Defendant as it continues to operate unlawfully without a Title V Permit.  If the Facility had shut down when its Title V Permit expired, as required by law, Plaintiff's members would no longer be harmed by any of Defendant's air pollution, including air pollution emitted beyond SIP permit limits.

43.     Plaintiff's members are further harmed by the delay caused by Woodville Pellets' failure to submit a timely Title V renewal application. Because Woodville Pellets has failed to install a required pollution control, and as a result of that failure as well as Woodville Pellets' frequent bypass of its existing controls is emitting hundreds of tons of unlawful air pollution each year, the renewed Title V Permit must include a compliance schedule to remedy this noncompliance. Defendant's failure to submit a timely Title V renewal application has delayed issuance of the Title V Permit and requisite compliance schedule. The renewed Title V Permit has yet to be issued.

44.     Further, when Woodville Pellets did finally submit its first Title V renewal application, less than three months before its permit expired, Woodville Pellets falsely certified that the Facility was in full compliance with the Clean Air Act. Woodville Pellets only acknowledges its unlawful emissions in its second Title V renewal application, submitted in September 2020, more than six months after the deadline to submit a renewal application. Woodville Pellets' failure to comply with administrative deadlines further delayed the implementation of a compliance schedule.

45.     In the meantime, Plaintiff's members will continue to be harmed by all of the air pollution emitted by the Facility that legally should not be operating, and especially harmed by the pollution that exceeds the limits in the SIP permit.

46.     Finally, Plaintiff's members are harmed by the fact that Woodville Pellets is no longer subject to the compliance assurance measures contained in the expired Title V Permit, such as monitoring, recordkeeping, and reporting requirements as well as the requirement to submit semiannual deviation reports and annual compliance certifications. For instance, Woodville Pellets is not under any duty to submit semiannual deviation reports while it does not hold a Title V Permit, nor to submit annual compliance certifications. These compliance-assurance measures would reduce the likelihood of noncompliance and their absence therefore harms Plaintiff's

members. Further, Plaintiff's members rely on these requirements to be informed about the compliance status of Woodville Pellets.

### III.    AUTHORITY TO BRING SUIT, JURISDICTION, AND VENUE

47.    Plaintiff's action against Woodville Pellets arises under the Clean Air Act for past and ongoing violations of its SIP Permit, the Texas SIP, and the Act. Plaintiff's action is related to Woodville Pellets' operation of a wood pellet manufacturing facility in Woodville, Texas, which is regulated by the Texas Commission on Environmental Quality ("TCEQ").

48.    Plaintiff has authority to bring the specific claims alleged below under 42 U.S.C. § 7604. Specifically, 42 U.S.C. § 7604(a)(1) authorizes civil action against "any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter."

49.    The Clean Air Act's citizen suit provision defines "emission standard or limitation under this chapter" as to include an "emission limitation, standard of performance or emission standard." 42 U.S.C. § 7604(f)(1). The Act additionally defines "emission standard or limitation under this chapter" to include "any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V [Title V] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations." 42 U.S.C. § 7604(f)(4).

50.    The specific claims alleged below arise from repeated and ongoing violations of emission limits and standards set forth in SIP Permit No. 98014 issued pursuant to Texas' federally approved SIP, and these violations are therefore enforceable under 42 U.S.C. § 7604(f)(1) and          § 7604(f)(4).

51.     Additionally, as a major source of air pollutants, Woodville Pellets must apply for and obtain a Title V operating permit that assures its compliance with all applicable requirements under the Clean Air Act, and comply with the operating permit's terms and conditions. 42 U.S.C. § 7661a(a). Until September 17, 2020, Woodville Pellets was subject to Federal Operating Permit No. O3609, which required that the "[p]ermit holder shall comply the requirements of New Source Review authorizations issued or claimed by the permit holder for the permitted area, including permits," and that requirements of such New Source Review permits "are incorporated by reference into this [Title V] permit as applicable requirements." Federal Operating Permit No. O3609, Condition 7 (Sep. 17, 2015).

52.     SIP Permit 98014 is a New Source Review permit that was incorporated into Federal Operating Permit No. O3609, and therefore violations of the conditions of SIP Permit 98014 occurring between September 17, 2015 and September 17, 2020 are also enforceable through Title V pursuant to 42 U.S.C. § 7604(f)(4).

53.     The Clean Air Act also prohibits facilities subject to Title V from operating without a Title V operating permit. 42 U.S.C. § 7661a(a). Federal Operating Permit No. O3609, issued September 17, 2015, expired on September 17, 2020, without being renewed. Violations arising from operating after the expiration of Federal Operating Permit No. O3609 are thus enforceable through Title V pursuant to 42 U.S.C. § 7604(f)(4).

54.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 7604(a) (Clean Air Act jurisdiction). An actual, justiciable controversy exists between Plaintiff and Defendant Woodville Pellets.

55.     The citizen suit provision of the Clean Air Act grants jurisdiction to United States District Courts to issue an injunction remedying violations of the Clean Air Act, to impose appropriate

civil penalties for violations of the Clean Air Act, and to award costs of litigation (including reasonable attorney fees and costs, including expert witness fees).

56.     Venue is properly vested in the Eastern District of Texas, Lufkin Division, pursuant to Section 304(c)(1) of the Clean Air Act, 42 U.S.C. § 7604(c)(1), as Woodville Pellets' Facility is located in this District.

## IV.    NOTICE

57.     On May 5, 2020, Plaintiff Sierra Club gave notice by certified mail to Woodville Pellets of the violations alleged in this complaint and their intent to sue over Counts One through Five, set forth below, under the Clean Air Act as required by 42 U.S.C. § 7604(b). Plaintiff also sent copies of the notice letter by certified mail to the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA, Region 6, the Director of the TCEQ, and the Attorney General of Texas. A copy of the Notice Letter is attached to this Amended Complaint as Exhibit A and incorporated by reference herein.

58.     The notice letter provided sufficient information to allow Woodville Pellets to identify and attempt to correct its violations of its federally enforceable SIP Permit, the Texas SIP, and the Act.

59.     More than sixty days have elapsed since the notice described in the preceding paragraph was properly served, and neither EPA nor TCEQ has commenced diligent prosecution of a civil or criminal action in a court to address the violations.

60.     On October 23, 2020, Plaintiff gave separate notice by certified mail to Woodville Pellets of an additional Clean Air Act violation alleged in this complaint—operating without a required Title V Permit, set forth below as Count Six—as well as their intent to sue under the Clean Air Act as required by 42 U.S.C. § 7604(b). Plaintiff also sent copies of the second notice letter by certified mail to the EPA, the Regional Administrator of EPA, Region 6, the Director of the TCEQ,

and the Attorney General of Texas. A copy of the Second Notice Letter is attached to this Amended Complaint as Exhibit B and incorporated by reference herein.

61.     Woodville Pellets has done nothing to stop or reduce its continuing discharge of unpermitted VOCs and HAPs that occur each day the plant operates.

62.     The Facility has likewise continued to utilize its unauthorized bypass stacks to emit PM, VOCs, HAPs, nitrogen oxides, carbon monoxide, and sulfur dioxide, smoke, soot, and dust.

63.     The Facility has continued to operate the Facility despite the expiration of its Title V Operating Permit and in the absence of a renewal of its Title V Operating Permit.

## V.     STATUTORY AND REGULATORY BACKGROUND

64.     A central purpose of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

65.     To achieve this and other purposes, the states bear primary responsibility under the Clean Air Act for regulating sources of air pollution and attaining ambient air quality standards. *See, e.g.,* 42 U.S.C. §§ 7401 (state responsibility) and 7410 (state implementation plan).

66.     Under Section 110(a) of the Clean Air Act, 42 U.S.C. § 7410(a), states implement many of the regulatory requirements of the Clean Air Act under SIPs. SIP provisions must satisfy the requirements of the Clean Air Act before they are approved by EPA. 42 U.S.C. § 7410(k).

67.     Section 110 of the Act, 42 U.S.C. § 7410, provides that each state shall adopt and submit for EPA approval a SIP. The SIP is intended to implement, maintain, and enforce national primary and secondary air quality standards with respect to the specific needs of each state. *See*, *e.g.*, 42 U.S.C. § 7410(a)(2)(C) (explaining that each SIP shall provide for the "regulation of the

modification and construction of any stationary source . . . to assure that national ambient air quality standards are achieved").

68.     In general, SIPs consist of state laws, regulations, and permits, and must provide for attainment and maintenance of the National Ambient Air Quality Standards. Once approved by EPA, SIPs become federal law and are enforceable by the state, EPA, and citizens under the Clean Air Act. 42 U.S.C. § 7410 (approval of SIPs); 42 U.S.C. § 7604(f)(4) (enforceability of SIPs).

69.     Texas regulations that have been approved by EPA as part of the state's federally enforceable SIP are identified at 40 C.F.R. § 52.2270. Texas issues permits to new and modified sources of air pollution pursuant to 30 Tex. Admin. Code Chapter 116, which has been approved by EPA into Texas' SIP. 40 C.F.R. § 52.2270(c).

70.     In addition to the SIP program, the Clean Air Act's Title V provisions require major stationary sources of air pollution to obtain and periodically renew operating permits which must incorporate all applicable requirements, including those contained in SIP permits. 42 U.S.C. §§ 7661-7661f. A Title V permit must include monitoring, recordkeeping, reporting, and compliance certification requirements sufficient to "assure compliance" with all applicable requirements under the Act. 42 U.S.C. § 7661c. Major stationary sources cannot lawfully operate without a Title V operating permit. 42 U.S.C. § 7661a(a).

71.     The federal regulations implementing Title V are published at 40 C.F.R. Part 70. These regulations establish the minimum requirements that state Title V programs must meet to receive federal approval.

72.     EPA has granted Texas approval to administer the Title V program for sources located in Texas. 40 C.F.R. Part 70 app. A. Texas' federally approved Title V regulations appear in 30 Tex. Admin. Code Chapter 122.

73.     The term of a Title V permit cannot exceed five years. 42 U.S.C. § 7661a(b)(5)(B). A source cannot continue operating after expiration of its Title V permit unless it "has submitted a timely and complete application" for a permit renewal. 42 U.S.C. §7661b(d). *See also* 40 C.F.R. §70.7(c)(1)(ii) ("Permit expiration terminates the source's right to operate unless a timely and complete renewal application has been submitted…"); 30 Tex. Admin. Code § 122.241(g) ("Permit expiration terminates the owner's or operator's right to operate, unless a timely and complete renewal application has been submitted."). A "timely" permit renewal application "is one that is submitted at least 6 months prior to the date of permit expiration …". 40 C.F.R. § 70.5(a)(1)(iii). *See also* 30 Tex. Admin. Code § 122.133(2) (defining "timely" for purposes of permit renewal applications as at least six months and no more than eighteen months prior to the permit expiration date). If a Title V permit holder submits a timely and complete renewal application, the permit holder "may continue to operate under the terms and conditions of the previously issued permit until final action is taken on the permit renewal application."  30 Tex. Admin. Code § 122.241(g).

74.     Section 304(a) of the Clean Air Act, 42 U.S.C. § 7604(a), authorizes citizens to bring suit for violation of any "emission standard or limitation" which is in effect under the Act.

75.     Section 304(f)(4) of the Act, 42 U.S.C. § 7604(f)(4), defines "emission standard or limitation," to include any standard or limitation which is applicable under an approved SIP, any standard or limitation established under Title V, any requirement under section 112 relating to HAPs, and "any requirement to obtain a permit as a condition of operations."

76.     Conditions of Title V permits are enforceable by citizens under 42 U.S.C. § 7604(f)(4).

16

## VI.    FACTS

### A.    THE FACILITY AND ITS EMISSIONS

77.    Woodville Pellets manufactures wood pellets that are exported overseas to be burned as fuel in power plants.

78.    Woodville Pellets is designed to produce approximately 72 tons of pellets per hour and is authorized to operate continuously for 8,000 hours per year.

79.    The Facility's annual production capacity is approximately 576,000 tons per year.

80.    The Woodville Pellets Facility was constructed by German Pellets beginning in 2012 and began operating in 2013. Woodville Pellets LLC, a subsidiary of Estonia-based Graanul Invest, acquired the Facility on June 18, 2019.

81.    The manufacturing process involves four main steps, each of which is a significant source of air pollution. First, wood is processed in green (or "wet") hammermills to produce small chips; second, the chips are dried in two large wood dryers heated by two industrial, wood-burning furnaces; third, the chips are again reduced in size in dry hammermills, producing "microchips"; finally, the microchips are pelletized in pellet presses, which raises the temperature of the wood significantly, requiring the use of pellet coolers.

82.    From the time the plant was constructed to the present, the Facility has operated several air pollution controls on the various units: the green hammermills, dry hammermills, and pellet coolers each are equipped with cyclones or baghouses for control of PM; these units have no controls to reduce VOC and HAP emissions. The furnaces and dryers vent emissions to a wet electrostatic precipitator for PM control and a regenerative thermal oxidizer ("RTO") for control of VOCs and HAPs.

83.    When German Pellets designed and constructed this Facility in 2011 and 2012, the industrial wood pellet industry was less than a decade old, and knowledge of emissions, especially

VOCs (and by extension, HAPs, because most HAPs at issue are also VOCs), was limited. German Pellets estimated the entire Facility would emit just 64 tons of VOCs per year, and therefore sought and received a "minor" New Source Review permit pursuant to 30 Tex. Admin. Code §§ 116.110-116.128 rather than a "major" New Source Review permit pursuant to 30 Tex. Admin. Code §§ 116.160-169. The emissions threshold for triggering major New Source Review applicability for this type of facility is 250 tons per year of any New-Source-Review-regulated air pollutant, which includes VOCs.

84.     In 2014, German Pellets began an audit of its emissions after testing at similar plants showed much higher than expected VOC emissions. In 2015, German Pellets admitted to TCEQ that the Facility actually emitted at least 580 tons of VOCs per year at full production. The additional 516 tons of VOCs were due to previously unknown emissions from the dry hammermills and pellet coolers. These units are frequently referred to as "post-dryer" units because they follow the dryer in the manufacturing process.

85.     As a result of the excess VOC emissions, German Pellets and TCEQ recognized that the Facility was emitting vastly higher levels of VOCs than permitted and also that the Facility should have been permitted as a major, rather than minor, source under the applicable New Source Review provisions.

86.     To remedy the noncompliance due to excess VOC emissions, German Pellets agreed to install an additional RTO control on the post-dryer units—the dry hammermills and pellet coolers—but had not begun installation of this control prior to selling the plant to Woodville Pellets.

87.     RTOs typically reduce VOC and HAP emissions from dry hammermills and pellet coolers by at least 95%. Accordingly, installation of an RTO on the post-dryer units would reduce Facility-

wide VOC emissions to below the 250 ton-per-year major New Source Review threshold, enabling the Facility to avoid complying with major New Source Review requirements.

88.     As originally designed and as currently operated, each of the four dry hammermills and each of the two pellet coolers exhaust through individual stacks. With the proposed new RTO, all of these stacks will be combined and controlled by the new RTO and emitted through a single new RTO stack.

89.     Woodville Pellets has not begun construction of the new RTO, but continues to operate the Facility.

**B.      SIP PERMITTING HISTORY**

90.     As the owner and operator of the Facility, Woodville Pellets LLC is in possession of permits issued by TCEQ which authorize a limited release of VOCs, HAPs, and other pollutants.

91.     Woodville Pellets is subject to the conditions of SIP Permit No. 98014, first issued on February 1, 2012, and most recently amended March 30, 2020.

92.     The SIP Permit specifies that any emission in excess of permit limits, from emission points other than those identified in the permit and/or containing contaminants not listed in the permit are violations of the permit.

93.     From the initial issuance of the SIP Permit until an April 5, 2019 permit amendment, the SIP Permit did not authorize any VOC or HAP emissions from the green hammermills, dry hammermills, and pellet coolers.

94.     The April 5, 2019 permit amendment authorized the construction of the new RTO, incorporated VOC limits for the new RTO, and implemented a Facility-wide HAP limit. Neither the April 5, 2019 permit amendment nor the March 30, 2020 amendment authorize the individual dry hammermills and pellet coolers, nor the green hammermills, to emit any VOCs or HAPs.

## C.   THE SIP PERMIT'S PROHIBITIONS ON EXCESS EMISSIONS

95.     Special Condition No. 1 of the SIP Permit states that "[t]his permit covers only those sources of emissions listed in the attached table entitled "Emission Sources—Maximum Allowable Emission Rates."

96.     General Condition 8 of the SIP Permit states that "[t]he total emissions of air contaminants from any of the sources of emissions must not exceed the values stated on the table attached to the permit entitled "Emission Sources—Maximum Allowable Emission Rates."

97.     Texas' federally approved and federally enforceable SIP provides that "[t]he total emissions of air contaminants from any of the sources of emissions at a facility must not exceed the values stated on the table attached to the permit." 30 Tex. Admin. Code § 116.115(b)(2)(F), most recently approved by EPA at 77 Fed. Reg. 65,119 (Oct. 25, 2012).

98.     Outside of the SIP permit, some limited emissions from planned routine startup, shutdown, and maintenance activities may be authorized under Permit by Rule ("PBR") 106.263.

99.     In short, any emission of a contaminant that is (a) not listed in the Maximum Allowable Emission Rates ("MAER") table, (b) from a source not identified on the MAER table, or (c) in excess of the rates listed on the MAER table violates the SIP Permit and Texas' SIP (or in the case of routine startup, shutdown, and maintenance emissions, if the emissions are authorized under PBR 106.263). As set forth below, Woodville Pellets' emission of numerous air contaminants has exceeded and continues to exceed the authorized emissions set forth in the MAER table attached to Woodville Pellets' SIP Permit and are not authorized by any PBR.

## D.   WOODVILLE PELLETS' EXCESS EMISSIONS

### 1.   Post-Dryer VOC Limits and Emissions

100.    The MAER table in the current version of the SIP Permit, as amended April 5, 2019 and March 30, 2020, only authorizes a combined VOC emission rate for the dry hammermills and

pellet coolers—as controlled by the future RTO—of 6.55 lb/hr and 26.25 tons per year ("tpy") (on a 12-month rolling basis).

101.   That limit applies specifically to the new RTO stack, which has not yet been installed.

102.   The MAER table in the current version of the SIP Permit does not authorize any VOC emissions from the existing stacks that vent directly from the dry hammermills and pellet coolers.

103.   These units in fact emit substantial amounts of VOCs when in operation.

104.   Woodville Pellets, in response to a TCEQ investigation, recently referenced stack testing conducted in February 2015, which produced an emission factor of 1.491 lb/ton of pellets. With that emission factor, hourly and annual post-dryer emissions at maximum capacity are 107 lb/hr and 429 tpy, respectively.

105.   Alternatively, after German Pellets conducted its audit in 2014 and 2015, the company reported to TCEQ that the post-dryer emission rates from operations at full capacity are as follows:

| Post-Dryer VOC Emissions | | |
|---|---|---|
| Source | Pounds Per Hour | Tons Per Year |
| Dry Mill Ia | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Ib | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Ic | 4.32 lb/hr | 17.27 tpy |
| Dry Mill Id | 4.32 lb/hr | 17.27 tpy |
| Cooler IIa | 55.77 lb/hr | 223.08 tpy |
| Cooler Iib | 55.77 lb/hr | 223.08 tpy |
| Total Emissions: | 128.82 lb/hr | 515.24 tpy |

106.   The rates reported by German Pellets to TCEQ are approximately 20% higher than the rates Woodville Pellets reported from the 2015 stack test.

### 2.   Green Hammermill VOC Limits and Emissions

107.   Woodville Pellets operates seven green hammermills, permitted as Emission Points No. IIIa through IIIg. The SIP Permit has never authorized any VOC emissions from these units, including the most recently amended version of the permit.

108.    Information from other wood pellet plants demonstrates that green hammermills are a significant source of VOC emissions.

109.    For instance, most pellet plants that operate green hammermills and are permitted as synthetic minor sources for major New Source Review avoidance (i.e. pellet plants that must limit facility-wide VOC emissions to less than 250 tpy) utilize RTOs to control VOCs from their green hammermills.

110.    Based on information and belief, each facility that has conducted stack testing on its green hammermills has shown significant emission rates, as shown below:

| Stack Test Results for VOC Emissions for Green Hammermills | | | |
|---|---|---|---|
| Facility | Emission Factor (lb/oven dried ton) | Emissions at Woodville Pellets Assuming 72 tons/hour Production Rate and 8,000 hours/year | |
| | | Hourly | Annual |
| MRE Crossville | 0.58 | 41.8 lb/hr | 167 tpy |
| Enviva Amory | 0.29 | 20.9 lb/hr | 84 tpy |
| Enviva Sampson | 0.203 | 14.6 lb/hr | 58 tpy |
| Enviva Wiggins | 0.2 | 14.4 lb/hr | 58 tpy |

111.    There is no evidence in the permitting record for this Facility that Woodville Pellets' green hammermills operate any differently from or emit fewer VOCs than those at other plants, nor is there any plausible claim that Woodville Pellets' green hammermills emit zero VOCs.

### 3.    HAP Emissions and Limits

112.    The 2019 amendment to the SIP Permit included, for the first time, Facility-wide limits on HAP emissions in the MAER table, limiting emissions of any individual HAP to less than 10 tpy and limiting the total HAP emissions to less than 25 tpy.

113.    Prior to the 2019 amendment, the SIP Permit only contained HAP limits for the dryer outlet RTO stack, meaning no other units were authorized to emit any HAPs.

114.    Neither German Pellets nor Woodville Pellets have conducted any emissions testing to demonstrate compliance with limits on HAP emissions.

115.    The most comprehensive set of emission factors for this industry, however, shows that Woodville Pellets' HAP emissions greatly exceed the 10 and 25 tpy limits in the 2019 SIP Permit.

116.    Enviva, the largest wood pellet manufacturing company in the world with eight existing plants, has developed emission factors for pellet plants comparable to the Woodville Pellets Facility based on numerous tests at its various facilities.

117.    Enviva recently reported, based on those emission factors, that a pellet plant comparable to Woodville Pellets emits 149 tpy of total HAPs.

118.    Specifically, applying the Enviva emission factors to Woodville Pellets' operations (at full capacity) show the following emission rates:

| Woodville Pellets Facility-Wide HAP Emissions | | |
|---|---|---|
| Pollutant | Emission Factor (lb/oven dried ton) | Annual Emissions at Full Capacity (576,000 tpy) |
| Total HAPs | 0.454 | 130 tpy |
| Methanol | 0.252 | 72.8 tpy |
| Acrolein | 0.064 | 18.4 tpy |
| Formaldehyde | 0.043 | 12.3 tpy |
| Phenol | 0.033 | 9.6 tpy |
| Propionaldehyde | 0.029 | 8.4 tpy |
| Acetaldehyde | 0.022 | 6.3 tpy |

### 4.    Dryer and Furnace Bypass Emissions and Limitations

119.    Woodville Pellets' two furnaces and two wood dryers each feature a bypass stack (for a total of four bypass stacks) that, when used, emit air contaminants directly to the atmosphere rather than to the existing pollution controls and the authorized emission point (the authorized emission point is permitted as Emission Point IV, "Dryers 1 and 2 WESP and RTO Stack").

120.    None of the four bypass stacks is listed in the MAER table as an authorized emission point, and therefore emissions of any pollutants from these stacks are unauthorized in the SIP permit.

121.     When Woodville Pellets utilizes the bypass stacks, the Facility emits VOCs, HAPs, PM, nitrogen oxides, carbon monoxide, and sulfur dioxide through the bypass stacks rather than through the existing, effective pollution control technology installed on the furnaces and dryers.

122.     Without the use of the pollution control technology, emissions of VOCs and HAPs from the furnaces and dryers are approximately 20 times higher than normal operations, and PM emissions are approximately 100 times higher than normal operations.

123.     Woodville Pellets has utilized its bypass stacks on dozens of occasions since acquiring the Facility.

**E.     WOODVILLE PELLETS' OPERATING AND PRODUCTION INFORMATION**

124.     The precise quantity of Woodville Pellets' excess emissions (other than from bypass events) is dependent on the Facility's production rate, in that higher production rates directly cause higher emissions.

125.     Woodville Pellets has not made the Facility's actual production rates public, other than one report to TCEQ wherein Woodville Pellets states that between April 5, 2019 and January 31, 2020, the Facility produced 341,388 tons of pellets. This number was not broken down into hourly, daily, or monthly rates, but works out to an average of 34,501 tons per month, 1,134 tons per day, and 47 tons per hour.

126.     Separately, Woodville Pellets has turned over some production records to Sierra Club as part of discovery in this matter, but those records are not complete nor sufficient to calculate precise emissions and violations to date.

127.     Finally, German Pellets reported emission rates to TCEQ covering the period between November 2018 (when the plant restarted operations after being idled for more than a year) and April 2019 indicating the Facility had produced approximately 117,155 tons of pellets during that period.

128.    Although Plaintiff does not yet have access to more complete and refined production rates, those records are maintained by Woodville Pellets.

F.    **WOODVILLE PELLETS' TITLE V PERMITTING HISTORY**

129.    Woodville Pellets' Title V Permit, Federal Operating Permit No. O3609, issued on September 17, 2015, authorized the Facility's operations for a five-year term, ending on September 17, 2020.

130.    To enable continued operation of the Facility under Federal Operating Permit No. O3609 after September 17, 2020, Woodville Pellets was required to submit a timely and complete permit renewal application. Because Texas law defines a "timely" application as no later than six months before the date of permit expiration, the latest Woodville Pellets could submit a timely permit renewal application was by March 17, 2020.

131.    Woodville Pellets did not submit a permit renewal application for Federal Operating Permit No. O3609 until July 1, 2020, less than three months before the Operating Permit's expiration date and more than three months after the deadline for submitting a timely permit renewal application.

132.    Because Woodville Pellets did not submit a timely and complete Title V permit renewal application by the applicable deadline, Federal Operating Permit No. O3609 expired on September 17, 2020.

133.    Moreover, Woodville Pellets' July 1, 2020 application included a false certification of compliance, claiming the Facility was in full compliance. Yet due to Woodville Pellets' failure to install a pollution control that TCEQ has already determined is required, as well as its frequent bypassing of those controls that it does have, the Facility emits hundreds of tons of illegal VOCs per year.

134.    Woodville Pellets submitted a new application for a Title V operating permit, Federal Operating Permit No. 4246, on September 15, 2020, two days before Federal Operating Permit No. O3609 expired.

135.    Texas has not yet issued a new Title V Operating Permit to Woodville Pellets.

136.    Based on information and belief, Woodville Pellets has continued operations at the Facility from September 17, 2020 to the present without a valid Title V Permit.

### VII.    CAUSES OF ACTION

### COUNT ONE: VIOLATIONS OF FEDERAL AND STATE PERMITTING REQUIREMENTS FOR UNAUTHORIZED VOC EMISSIONS FROM THE DRY HAMMERMILL AND PELLET COOLER UNITS

137.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 136, as if the same were repeated verbatim herein.

### 1.    The Facility is not authorized to emit any VOCs from the Hammermill and Pellet Cooler Units.

138.    The April 5, 2019 SIP Permit Amendment authorizing VOC emissions from the post-dryer units applies only to the RTO emission point; this emission point does not yet exist.

139.    No version of the SIP Permit, including the April 9, 2019 SIP Permit nor the most recent March 30, 2020 SIP Permit, has ever authorized the four individual dry hammermills and two pellet cooler stacks to emit VOCs.

140.    Accordingly, all VOC emissions from the dry hammermills and pellet coolers are unauthorized and constitute violations of Special Condition No. 1 and General Condition No. 8 of Permit 98014 and the Texas SIP, 30 Tex. Admin. Code § 116.115(b)(2)(F).

141.    As discussed above in paragraphs 104-105, both the dry hammermills and pellet coolers in fact emit significant amounts of VOCs. At the full production capacity of 72 tons per hour, the

pellet coolers and dry hammermills emit 2,574 pounds of VOCs per day based on the emission factor from the 2015 stack test.

142.    Each day Woodville Pellets has operated any of the four dry hammermills (permitted as Emission Point Nos. Ia, Ib, Ic, and Id, and alternatively as Source Name: Dry Mill Filter No. 1 through 4 Baghouse Stacks) since acquiring the plant on June 18, 2019, and each day Woodville Pellets continues to operate any of these dry hammermill units, is an individual violation. Operation of each individual dry hammermill is an individual violation.

143.    Each day Woodville Pellets has operated either or both of the two pellet coolers (permitted as Emission Point Nos. IIa and IIb, and alternatively as Source Name: Cooler Air Aspiration Filter No. 1 and No.2 Baghouse Stack) since acquiring the plant on June 18, 2019, and each day Woodville Pellets continues to operate either or both of these pellet cooler units, is an individual violation. Operation of each individual pellet cooler is an individual violation.

144.    Although Plaintiff does not have access to complete and precise production data, at a minimum Woodville Pellets reported to TCEQ that the Facility produced 341,388 tons of pellets between April 5, 2019 and January 31, 2020, which equates to an average pellet production rate of 1,134 tons per day.

145.    Upon information and belief, Woodville Pellets has operated these post-dryer units on a continuing basis since January 31, 2020.

146.    Upon discovery of the specific operating information for these post-dryer units, known to Woodville Pellets, Plaintiff will be able to determine the dates that these specific violations have occurred.

**2.**     **In the alternative, if the new RTO Stack limits apply, the Facility has exceeded its VOC emission limits for the Hammermill and Pellet Cooler Units on numerous occasions.**

147.     Alternatively, if the MAER limits applicable to the yet-to-be-constructed RTO stack set forth in the in the April 2019 version of the Facility's SIP Permit – an hourly limit of 6.55 lb/hr and annual limit of 26.25 tpy (on a 12-month rolling basis) – are considered applicable to emissions vented directly from the Facility's dry hammermill and pellet cooler stacks, Woodville Pellets has exceeded these limits and will continue to do so if the Facility continues operating.

**a.**     **The Facility has exceeded its annual limit for the post-dryer units if the RTO Stack limits apply.**

148.     Based on the emission factors reported from the 2015 stack testing, each month the Facility's rolling 12-month pellet production rate exceeds or has exceeded 35,212 tons, Woodville Pellets emits and has emitted VOCs in quantities that exceed the annual MAER VOC limit of 26.25 tpy.

149.     Specifically, the 2015 stack testing produced an emission factor for all of the post-dryer units of 1.491 pounds of VOC emissions for every ton of pellets produced. Therefore, when the Facility produces 35,212 tons of pellets in a 12-month period, the post-dryer units emit 26.25 tons of VOCs.

150.     Based on emissions information provided by German Pellets to TCEQ, when Woodville Pellets acquired the plant in June 2019, the Facility's rolling 12-month production rate was at least 117,244 tons based on production between November 2018 and April 2019.

151.     The Facility then produced 341,388 tons of pellets between April 5, 2019 and January 31, 2020, an average of 34,501 tons per month.

152.     Upon information and belief, Woodville Pellets has continued to operate at similar or higher production rates since January 31, 2020.

153.    Based upon the foregoing, Woodville Pellets' 12-month rolling production rate has vastly exceeded 35,212 tons in each month since Woodville Pellets acquired the plant on June 18, 2019.

154.    Therefore, Woodville Pellets has violated the annual MAER VOC limit each month since acquiring the plant and will continue to violate the annual MAER VOC limit each month the Facility's 12-month rolling production rate exceeds the 35,212 tpy threshold.

>    **b.    The Facility has routinely exceeded its hourly limit for both post-dryer units if the RTO Stack limits apply.**

155.    Based on the emission factors from the 2015 stack test, each day that the post-dryer units produce or have produce more than 4.39 tons in any single hour, Woodville Pellets' post-dryer VOC emissions exceed the 6.55 lb/hour limit on VOCs emissions.

156.    Specifically, the 2015 stack testing produced an emission factor for all of the post-dryer units of 1.491 pounds of VOC emissions for every ton of pellets produced. Therefore, whenever the post-dryer units produce 4.39 tons of pellets in one hour, the post-dryer units emit 6.55 pounds of VOCs.

157.    Based on information and belief, the Facility produces far more than 4.39 tons of pellets per hour every hour that it operates under normal circumstances. For instance, the average hourly production rate between April 5, 2019 and January 31, 2019 was 47 tons per hour, and the Facility has the capacity to produce up to 72 tons per hour.

158.    As a result, between acquiring the plant and the date of filing, Woodville Pellets has violated the hourly emission limit for VOCs in SIP Permit No. 98014 for thousands of hours based on its operations of the Dry Hammermill and Pellet Cooler Units.

159.    Each day the Facility has operated these units at a production rate greater than 4.39 tons per hour is an individual violation.

### 3. Relief requested to redress Count One (applicable to each asserted claim under this Count, including the alternative claim)

160. As described above, Woodville Pellets has repeatedly exceeded the hourly and annual emission standards for VOCs in the Facility's SIP Permit based on its operations of the Dry Hammermill and Pellet Cooler Units. These exceedances violate SIP Permit No. 98014.

161. Defendant's violations of its SIP Permit, the Texas SIP, and the Act are continuing and/or intermittent.

162. Because of this extensive history of violations, Plaintiff believes and alleges that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

163. Woodville Pellets is subject to an injunction ordering it to cease its violations of its SIP Permit, the Texas SIP, and the Act.

164. Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

165. For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable, each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiff's notice of intent to sue.

## COUNT TWO:  UNLAWFUL VOC EMISSIONS FROM THE GREEN HAMMERMILLS

166. Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 165, as if the same were repeated verbatim herein.

167.   The SIP permit does not authorize any VOC emissions from the seven green hammermills.

168.   Because the green hammermills are a significant source of VOCs as described in paragraphs 107-111, each day the plant has operated or operates the green hammermills, Woodville Pellets violates and has violated Special Condition No. 1 and General Condition No. 8 of the SIP Permit and the Texas SIP itself, 30 Tex. Admin Code § 116.115(b)(2)(F).

169.   Operation of each of the seven green hammermills (permitted as Emission Point Nos. IIIa through IIIg, and alternatively as Source Name: Wet Mill Aspiration Cyclone No. 1 through 7 Stacks) is an individual violation.

170.   Defendant's violations of its SIP Permit, the Texas SIP, and the Act are continuing and/or intermittent.

171.   Because of this extensive history of violations, Plaintiff believes and alleges that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP and the Act.

172.   Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act.

173.   Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

174.   For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred,

and is presumed to continue for each day and every day on and after the giving of Plaintiff's notice of intent to sue.

## COUNT THREE: VIOLATIONS OF PERMIT LIMITS ON
## FACILITY-WIDE HAP EMISSIONS

175.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 174, as if the same were repeated verbatim herein.

### 1.    *The Facility has exceeded its Facility-wide HAP emission limits.*

176.    The April 5, 2019 SIP Permit Amendment instituted Facility-wide limits on total HAP emissions (25 tpy) and individual HAP emissions (10 tpy) for the purpose of restricting the Facility's emissions to below the "major source" level set forth in Clean Air Act § 112(a)(1), 42 U.S.C. § 7412(a)(1).

177.    These limits apply Facility-wide and on a 12-month rolling basis.

178.    Using the Enviva emission factors discussed above in paragraphs 112-118, based on information and belief, Woodville Pellets exceeds the 25 tpy total HAP limits whenever it produces 111,000 tons of pellets or more in a 12-month period.

179.    Based on the same Enviva emission factors, the Facility also exceeds the individual HAP limit of 10 tpy whenever 12-month production rates equal or exceed the following amounts: methanol emissions exceed 10 tpy at a production rate of 80,000 tpy, acrolein emissions exceed 10 tpy at a production rate of 315,000 tpy, and formaldehyde emissions exceed 10 tpy at a production rate of 475,000 tpy.

180.    Each month the Facility's rolling 12-month production of pellets exceeds or has exceeded any of these production rates, Woodville Pellets violates and has violated the total and/or individual annual HAP limits in Permit 98014, Special Condition No. 1 and General Condition No. 8 of the SIP Permit, and 30 Tex. Admin. Code § 116.115(b)(2)(F).

181.    As noted above, Woodville Pellets has a production capacity of approximately 576,000 tpy.

182.    While Plaintiff does not yet have access to complete and precise production rates, production records submitted to the TCEQ by Woodville Pellets for the period of April 5, 2019 through January 31, 2020 (wherein the Facility produced a total of 341,388 tons of pellets during that period) show that, at a minimum, Woodville Pellets has exceeded the MAER limit on total HAPs and the individual HAP limit for methanol and acrolein.

183.    Upon information and belief, the Facility has continued operating and producing pellets each month since January 31, 2020.

184.    Upon information and belief, the Facility's 12-month rolling production has exceeded 111,000 tons in each month from April 2019 (inclusive) to the present.

185.    Upon information and belief, the Facility's total HAP emissions has exceeded the 25 tpy limit on total HAP in each month from June 2019 (inclusive) to the present.

186.    Upon discovery of more specific operating information and production rates for the Facility, known to Woodville Pellets, Plaintiff will be able to identify the specific dates of Defendant's violations of the Facility-wide HAP limits for individual HAPs.

### 2.    In the alternative, if the Facility-Wide HAP limits do not apply, the Facility has exceeded its HAP Emission Limits for the Green Hammermill, Dry Hammermills, and Pellet Cooler Units.

187.    Alternatively, if the Facility-wide 10 tpy and 25 tpy limits do not apply under the theory that those limits are premised on the installation of the new RTO control, then the green hammermills, dry hammermills, and pellet coolers are not authorized to emit *any* amount of HAPs.

188.    Each of the units listed in the previous paragraph emit significant amounts of individual HAPs, specifically acetaldehyde, acrolein, formaldehyde, methanol, phenol, and propionaldehyde.

189.    Because each of these units in fact emits significant levels of the individual HAPs listed in previous paragraph, each day Woodville Pellets operates and has operated these units it violates and has violated Special Condition No. 1 and General Condition 8 of the SIP Permit and the Texas SIP, 30 Tex. Admin. Code § 116.115(b)(2)(F).

190.    Emissions of each individual HAP from each individual unit is an individual violation.

### 3.    *Relief requested to redress Count Three (applicable to each asserted claim under this count, including the alternative claim)*

191.    Because of this extensive history of violations, Plaintiff believes and alleges that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

192.    Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act.

193.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

194.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable, each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2) of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiff's notice of intent to sue.

**COUNT FOUR:  VIOLATIONS OF THE SIP PERMIT RELATED TO
UNAUTHORIZED RELEASE OF POLLUTANTS THROUGH THE BYPASS STACKS**

195.   Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 194, as if the same were repeated verbatim herein.

196.   Woodville Pellets is in violation of Special Condition No. 1 and General Condition No. 8 of the SIP Permit and the Texas SIP itself, 30 Tex. Admin Code § 116.115(b)(2)(F) each time it utilizes and has utilized the dryer and furnace bypass stacks to release emissions, unless those emissions were properly authorized under Permit by Rule 106.263 as routine startup, shutdown, or maintenance emissions.

197.   Based on information and belief, these releases have occurred on dozens of occasions since Woodville Pellets acquired the facility, including the dates specified in the table below:

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| 7/5/2019 | X | |
| 7/6/2019 | X | |
| 7/9/2019 | X | |
| 7/13/2019 | | X |
| 7/15/2019 | | X |
| 7/24/2019 | X | |
| 7/25/2019 | X | |
| 7/31/2019 | X | |
| 8/2/2019 | X | |
| 8/5/2019 | X | |
| 8/6/2019 | X | |
| 8/9/2019 | X | |
| 8/14/2019 | X | X |
| 8/15/2019 | X | X |
| 9/6/2019 | Either or both. | |
| 9/19/2019 | X | X |

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| 9/20/2019 | X | X |
| 9/22/2019 | | X |
| 10/18/2019 | X | X |
| 11/11/2019 | | X |
| 11/26/2019 | Either or both. | |
| 11/27/2019 | Either or both | |
| 12/22/2019 | Either or both | |
| 12/29/2019 | X | X |
| 1/3/2020 | X | |
| 1/6/2020 | X | X |
| 1/7/2020 | X | X |
| 1/9/2020 | X | X |
| 1/10/2020 | | X |
| 1/11/2020 | Either or both | |
| 1/21/2020 | X | X |
| 1/22/2020 | X | |
| 1/29/2020 | | X |
| 2/6/2020 | X | X |
| 2/7/2020 | | X |
| 2/9/2020 | | X |
| 2/10/2020 | X | X |
| 2/15/2020 | Either or both | |
| 2/16/2020 | X | X |
| 2/17/2020 | | X |
| 2/18/2020 | X | X |
| 2/21/2020 | | X |
| 2/22/2020 | X | X |
| 3/1/2020 | X | |
| 3/16/2020 | X | X |
| 3/17/2020 | X | |
| 3/21/2020 | X | |
| 4/11/2020 | X | X |
| 4/28/2020 | | X |
| 5/24/2020 | X | X |

36

| Date (on or about) | Dryer Bypass Stack Utilized | Furnace Bypass Stack Utilized |
|---|---|---|
| 6/8/2020 | | X |
| 6/11/2020 | X | X |
| 7/6/2020 | X | |
| 8/14/2020 | X | |
| 9/18/2020 | X | |
| 10/23/2020 | X | |
| 10/27/2020 | X | |
| 11/24/2020 | X | |
| 11/30/2020 | X | |
| 12/10/2020 | X | |

198.    Upon discovery of more specific operating information for the Facility, known to Woodville Pellets, Plaintiff will be able to determine additional dates which indicate unauthorized release of emissions via the dryer or furnace bypass stacks and to verify the dates identified above.

199.    Because of this extensive history of violations, Plaintiff believes and alleges that, without the appropriate civil penalties and the issuance of an injunction, Woodville Pellets will continue to violate its SIP Permit, the Texas SIP, and the Act.

200.    Woodville Pellets is subject to an injunction ordering Woodville Pellets to cease its violations of its SIP Permit, the Texas SIP, and the Act by utilizing the dryer bypass stack or the furnace bypass stack.

201.    Woodville Pellets is subject to an assessment of civil penalties for its violations of its SIP Permit, the Texas SIP, and the Act, pursuant to Sections 113(e) and 304(a) and (g), 42 U.S.C. §§ 7413(e) and 7604(a) and (g).

202.    For the purpose of assessing the maximum penalty for which Woodville Pellets may be liable each instance of Woodville Pellets' violation of its SIP Permit, the Texas SIP, and the Act, constitutes a separate violation of Section 304 pursuant to Sections 304(a), 113(b), and 113(e)(2)

of the Act, 42 U.S.C. §§ 7604(a), 7413(b)(1) and 7413(e)(2), for each day on which it has occurred, and is presumed to continue for each day and every day on and after the giving of Plaintiff's notice of intent to sue.

## COUNT FIVE:  THIS COUNT IS WITHDRAWN

203.    Plaintiff withdraws Count Five.

## COUNT SIX: VIOLATIONS OF FEDERAL AND STATE PROHIBITIONS AGAINST OPERATING WITHOUT A TITLE V PERMIT

204.    Plaintiff hereby realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 203, as if the same were repeated verbatim herein.

205.    Title V of the Clean Air Act states:

> [I]t shall be unlawful for any person . . . to operate an affected source (as provided in subchapter IV-A), . . . , except in compliance with a permit issued by a permitting authority under this subchapter.

42 U.S.C. § 7661a(a).

206.    Texas laws implementing Title V of the Clean Air Act state that a Title V Federal Operating Permit "shall expire no later than five years from initial issuance or renewal."  30 Tex. Admin. Code § 122.241(a).  "Permit expiration terminates the owner's or operator's right to operate, unless a timely and complete renewal application has been submitted." 30 Tex. Admin. Code § 122.241(g). If a permit holder submits a timely and complete permit renewal application, "the permit holder may continue to operate under the terms and conditions of the previously issued permit until final action is taken on the permit renewal application." *Id.*

207.    A timely permit renewal application is defined as follows:

> [O]ne that is submitted . . . at least six months, but no earlier than 18 months, before the date of permit expiration;

30 Tex. Admin. Code § 122.133(2).

208.    Woodville Pellets' Title V Permit, Federal Operating Permit No. O3609, which was issued on September 17, 2015, expired on September 17, 2020.

209.    Woodville Pellets did not submit a permit renewal application for a Federal Operating Permit No. O3609 until July 1, 2020. Because this date was less than six months before the permit's expiration date, the permit renewal application was not timely. Moreover, the July 1, 2020 application was not complete because it failed to contain a compliance schedule and falsely certified that the facility was in full compliance with the Clean Air Act.

210.    Because Woodville Pellets did not submit a timely and complete renewal application, Woodville Pellets could not continue operating after the expiration date of its Title V Permit.

211.    Woodville Pellets submitted a new permit application for a Title V operating permit, Federal Operating Permit No. O4246, on September 15, 2020.  TCEQ has not yet granted or denied Woodville Pellets' Title V permit application.

212.    Based on information and belief, Woodville Pellets has continued operating the Facility even after Federal Operating Permit No. O3609 expired on September 17, 2020 and without a new Title V Permit.

213.    Each day that Woodville Pellets has operated and continues to operate the Facility in the absence of a Title V Permit violates the Clean Air Act.

214.    Each day that Woodville Pellets has operated and continues to operate the Facility in the absence of a Title V Permit injures Sierra Club's members. If Woodville Pellets had submitted a timely and complete application for a renewal permit, its operations would continue to be governed by the terms of Federal Operating Permit No. O3609, including the requirements to promptly report any deviation from a permit condition, submit a report summarizing the results of monitoring at least every six months, and file an annual certification of compliance with permit

conditions that is signed by a responsible official. 42 U.S.C. § 7661c(c), 40 C.F.R. 70.6(3). Under Title V, all such reports and certifications must be publicly available. 42 U.S.C. § 7414(c). These requirements, along with the permit's monitoring, recordkeeping, and reporting requirements, are designed to assure the Facility's compliance with applicable Clean Air Act requirements.   42 U.S.C. § 7661c.

215.    If the Facility were still subject to the terms of Federal Operating Permit No. O3609, Plaintiff could enforce those terms against Woodville Pellets in federal court. Due to Woodville Pellets' failure to submit a timely and complete permit renewal application, the Facility's Federal Operating Permit has expired, and, thus, Plaintiff no longer receives the benefit of Title V's compliance assurance mechanisms. The loss of these benefits denies Plaintiff's members access to reliable information regarding the Facility's emissions. Moreover, in the absence of a Federal Operating Permit designed to hold Woodville Pellets accountable for complying with applicable emission limitations, it is more likely that Woodville Pellets will violate such limitations, thereby increasing Plaintiff's member's risk of being exposed to unhealthy air quality.

216.    Further, Woodville Pellets' failure to submit a timely Title V application delayed the issuance of a renewed Title V permit that would necessarily include a compliance schedule containing enforceable remedial measures that would speed the process of bringing Woodville Pellets into compliance, meaning it is likely that Plaintiff's members will be exposed to the Facility's unlawful air pollution for a greater time period.

217.    Finally, because expiration of Federal Operating Permit No. O3609 on September 17, 2020 terminated Woodville Pellets' right to operate, Plaintiff's members should not have been exposed to any air pollution from the Facility after that date. Accordingly, Plaintiff's members suffer an

injury each day that Woodville Pellets persists in operating without a valid Federal Operating Permit designed to protect the public from unlawful air pollution.

## VIII.   EXHIBITS

218.   Plaintiff attaches and incorporates by reference the following exhibits identified in this Complaint:

Exhibit A       Notice of Intent to Sue

Exhibit B       Second Notice of Intent to Sue

## IX.   JURY DEMAND

219.   Plaintiff, by and through the undersigned, hereby demand a trial by jury on all issues triable under law.

## X.   PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for judgment against Defendant based on the following prayer:

(a) Declare that Defendant has violated and is in continuing violation of its SIP Permit No. 98014, the Texas SIP, and the Clean Air Act and its applicable regulations;

(b) Declare that Defendant has violated federal law by failing to possess a valid Title V operating permit from September 17, 2020 to the time its new application for a Title V operating permit, Permit No. 4246, is approved, if at all;

(c) Permanently enjoin Defendant from operating its Facility in Woodville, Texas in such a manner that will result in further violations of its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations;

(d) Permanently enjoin Defendant from operating without a valid Title V Operating Permit;

(e) Order Woodville Pellets to comply with all emission standards and limitations of its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations;

(f) Order the Defendant to take appropriate actions to remedy, mitigate or offset the harm to public health and the environment caused by the violations of the Clean Air Act and its applicable regulations alleged above;

(g) Assess a civil penalty against Defendant of up to $102,638 per day for each violation of its SIP Permit, the Texas SIP, and the Clean Air Act and its applicable regulations, as provided by 42 U.S.C. §§ 7413(e) and 7604(a) and (g), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 C.F.R. § 2461 and 40 C.F.R. § 19.4;

(h) Assess a civil penalty against Defendant of up to $102,638 per day for each day the Facility operates without a Title V Operating Permit from September 17, 2020 until its application for a new Title V Operating Permit is approved. *Id.*

(i) Order Defendants to pay Plaintiff's reasonable attorney's fees and costs (including expert witness fees and costs) as provided by 42 U.S.C. § 7604(d);

(j) Award Plaintiff their costs of suit as provided by 42 U.S.C. § 7604(d);

(k) Award pre- and post-judgment interest at the highest rates recoverable under applicable law; and

(l) Grant Plaintiff any such other and further relief as the Court deems just and proper.

Dated: April 2, 2021.

Respectfully submitted,

/s/ Patrick J. Anderson
Patrick J. Anderson (Lead)
*Admitted pro hac vice*
Georgia State Bar No. 226260
Environmental Integrity Project
315 W. Ponce de Leon Ave, Suite 842
Decatur, Georgia 30030
Tel.: (719) 963-4072
Fax: (470) 387-0841
panderson@environmentalintegrity.org

Keri N. Powell
*Admitted pro hac vice*
Georgia State Bar No. 437963
Environmental Integrity Project
315 W. Ponce de Leon Ave, Suite 842
Decatur, Georgia 30030
Tel.: (678) 902-4450
Fax: (470) 387-0821
kpowell@environmentalintegrity.org

George Eric Hays
Law Office of George E. Hays
PO Box 843
Bellevue, WA 98009
Tel.: (415) 716-9159
Fax: (470) 387-0821
georgehays@mindspring.com

Eric Schaeffer
*Admitted pro hac vice*
District of Columbia Bar No. 427669
Environmental Integrity Project
1000 Vermont Ave NW, Suite 1100
Washington, D.C. 20005
Tel.: (202) 263-4440
Fax: (202) 296-8822
eschaeffer@environmentalintegrity.org

**ATTORNEYS FOR PLAINTIFF
SIERRA CLUB**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of Plaintiff's Second Amended Complaint was served on the counsel stated below, pursuant to the Federal Rules of Civil Procedure, through the Eastern District of Texas CM/ECF E-File System on April 2, 2021:

Craig A. Stanfield
J. Robert Sheppard, III
Christie L. Cardon
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
cstanfield@kslaw.com
rsheppard@kslaw.com
ccardon@kslaw.com

Steven M. Zager
Mike Stenglein
King & Spalding LLP
500 West 2nd Street, Suite 1800
Austin, Texas 78701
szager@kslaw.com
mstenglein@kslaw.com

**ATTORNEYS FOR DEFENDANT**
**WOODVILLE PELLETS, LLC**

*/s/ Patrick Anderson*
Patrick J. Anderson